**OBH, INC. and Columbia Insurance Company, Plaintiffs,**

v.

**SPOTLIGHT MAGAZINE, INC. and Claude Tortora, Defendants.**

**No. 99–CV–746A.**

United States District Court,
W.D. New York.

Feb. 28, 2000.

---

Charles Swanekamp, Jaeckle, Fleischmann, Buffalo, NY, for OBH Inc., plaintiffs.

Alan Donatelli, Phillips, Lytle, Hitchcock, Blaine & Huber, LLP, Buffalo, NY, for Spotlight Magazine, Inc., defendants.

## DECISION AND ORDER

ARCARA, District Judge.

### *INTRODUCTION*

Currently before the Court is the motion of plaintiffs OBH, Inc. ("OBH") and Columbia Insurance Company ("Columbia") for a preliminary injunction enjoining defendants Spotlight Magazine, Inc. ("Spotlight") and Claude Tortora ("Tortora") from using plaintiffs' trademark, "The Buffalo News," as the domain name for a web site operated by defendants ("www.thebuffalonews.com"). For the reasons stated herein, the Court grants the motion for preliminary injunction. The following constitutes the Court's findings of fact and conclusions of law in accordance with Rules 52(a) and 65(d) of the Federal Rules of Civil Procedure.

### *FINDINGS OF FACT*

**A. *The Internet, the World Wide Web and Domain Names***

To understand fully the facts of this case and how they relate to the legal issues that the Court must resolve, some basic knowledge of the workings of the Internet and the World Wide Web (the "Web") is necessary. "The Internet is a global network of

interconnected computers which allows individuals and organizations around the world to communicate and to share information with one another." *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1044 (9th Cir.1999); *see also Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573, 2000 WL 48668, at *12 n. 1 (2d Cir. Jan.21, 2000) ("The Internet is a vast system of interconnected computers and computer networks."). "The Internet is not a physical or tangible entity, but rather a giant network which interconnects innumerable smaller groups of linked computer networks. It is thus a network of networks." *Jews for Jesus v. Brodsky*, 993 F.Supp. 282, 287 n. 2 (D.N.J.1998) (internal quotations and citation omitted). The Web is a collection of information resources contained in documents located on individual computers around the world and is the most widely used and fastest-growing part of the Internet except perhaps for electronic mail or "e-mail." *Brookfield*, 174 F.3d at 1044 (citing *United States v. Microsoft*, 147 F.3d 935, 939 (D.C.Cir.1998)).

The Web contains multimedia "web pages"—computer data files written in Hypertext Markup Language ("HTML")—which contain information such as text, pictures, sounds, and audio and video recordings. *See id.*; *Reno v. ACLU*, 521 U.S. 844, 849–53, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997); *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1318 (9th Cir. 1998). An Internet user can move from one web page to another with just the click of the mouse.[1] *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 490 (2d Cir.2000).

> Over the last few years, the commercial side of the Internet has grown rapidly. Web pages are now used by companies to provide information about their products in a much more detailed fashion than can be done through a standard advertisement. Moreover, many consumers and businesses now order goods and services directly from company web pages. Given that Internet sales are paperless and have lower transaction costs than other types of retail sales, the commercial potential of this technology is vast.

*Id.* at 491. Thus, businesses are racing to stake out a spot on the Web in order to sell their goods and services.

"Each web page has a corresponding domain address, which is an identifier somewhat analogous to a telephone number or street address." *Brookfield*, 174 F.3d at 1044. Domain names consist of a second-level domain—simply a term or series of terms (*e.g.*, "thebuffalonews")—followed by a top-level domain, many of which describe the nature of the enterprise. Top-level domains include ".com" (commercial), ".edu" (educational), ".org" (non-profit and miscellaneous organizations), ".gov" (government), ".net" (networking provider), and ".mil" (military). *See id.* (citing *Panavision*, 141 F.3d at 1318). "Commercial entities generally use the '.com' top-level domain, which also serves as a catchall top-level domain." *See id.* "Each domain name is unique." *Sporty's Farm*, 202 F.3d 489, 491.

Until recently, domain names with the ".com" top-level domain could only be obtained from Network Solutions, Inc. ("NSI"). *Id.* at 492. Now other registrars may also assign them. *Id.* But all these registrars grant such names primarily on a first-come, first-served basis upon payment of a small registration fee. *Id.* Because each web page must have a unique domain name, the registrar checks to see whether the requested domain name has already been assigned to someone else. If so, the applicant must choose a different domain name. The registrar does not generally inquire into whether a given domain name request matches a trademark held

---

1. A mouse is a device that allows a computer user to issue commands by moving a marker across the screen and then clicking on the symbol, word, or icon that represents the particular information that the user wants to access.

by someone other than the person requesting the name. *Id.* In other words, anyone may register any unused domain name upon payment of the required fee; the registrar does not make any type of legal determination as to whether the requested domain name would infringe an existing trademark. Of course, registration of a domain name in no way trumps federal trademark law; registration does not itself confer any trademark rights on the registrant. *Washington Speakers Bureau, Inc. v. Leading Authorities, Inc.*, 33 F.Supp.2d 488, 491 n. 3 (E.D.Va.1999).

Using a Web browser, such as Netscape's Navigator or Microsoft's Internet Explorer, an Internet user may navigate the Web—searching for, communicating with, and retrieving information from various web sites. *See Brookfield,* 174 F.3d at 1044 (citations omitted). A specific web site is most easily located by using its domain name. *See Panavision,* 141 F.3d at 1327. Upon entering a domain name into the web browser, the corresponding web site will quickly appear on the computer screen. Sometimes, however, a user will not know the domain name of the site he or she is looking for, whereupon he or she has two principal options: trying to guess the domain name or seeking the assistance of an Internet "search engine." *Brookfield,* 174 F.3d at 1044.

Oftentimes, an Internet user will begin trying to guess at the domain name, especially if there is an obvious domain name to try. Users often assume, as a rule of thumb, that the domain name of a particular company will be the company name followed by ".com." *See id.* at 1045. For example, if a user wanted information about a Ford automobile, he or she could find such information at "ford.com." Sometimes, a trademark is better known than the company itself, in which case a user may assume that the domain address will be " 'trademark'.com." *See id.* (citing *Beverly v. Network Solutions, Inc.*, 1998 WL 320829, at *1 (N.D.Cal. June 12, 1998) ("Companies attempt to make the search

for their web site as easy as possible. They do so by using a corporate name, trademark or service mark as their web site address.")). For instance, a user seeking the Kentucky Fried Chicken web site might presume, correctly as it happens, that entering the address "www. KFC.com" will turn up a Kentucky Fried Chicken web site. Guessing domain names, however, is not an exact science. The user who assumes that " 'X'.com" will always correspond to the web site of company X or trademark X will sometimes be misled. For example, one looking for information about Delta Airlines might sensibly try "delta.com." However, that domain name turns up a web site for Delta Financial Corporation, an unrelated company (Delta Airlines web site is actually "deltaairlines.com").

An Internet user's second option when he or she does not know the domain name is to utilize an Internet search engine, such as Yahoo, Altavista, or Lycos. *See id.* (citations omitted). When a keyword is entered, the search engine processes it through an index of web sites to generate a list relating to the entered keyword. Each search engine uses its own algorithm to arrange indexed materials in sequence, so the list of web sites that any particular set of keywords will bring up may differ depending on the search engine used. *See id.* (citations omitted).

> Search engines look for keywords in places such as domain names, actual text on the web page, and metatags. Metatags are HTML code intended to describe the contents of the web site. There are different types of metatags, including "description" and "keyword" metatags. The description metatags are intended to describe the web site; the keyword metatags, at least in theory, contain keywords relating to the contents of the web site. The more often a term appears in the metatags and in the text of the web page, the more likely it is that the web page will be "hit" in a search for that keyword and the higher

on the list of "hits" the web page will appear.

*Id.*

Given the current state of search engine technology, that search will often produce a list of hundreds of web sites through which the user must sort in order to find what he or she is looking for. As a result, companies strongly prefer that their domain name be comprised of the company or brand trademark and the suffix ".com."

*Sporty's Farm,* 202 F.3d 489, 491.

Because a particular domain name can only identify one web site, just as a particular mailing address can only identify one physical location, a company that owns an intuitive domain name owns a potentially valuable asset, as ownership of such a name makes it more likely that users will be able to accurately guess its web site address and visit its corporate web site rather than the web site of a competitor. The value of this intuitive name is magnified by the fact that there is no exhaustive, central listing of Internet domain names equivalent to a telephone book. *See Washington Speakers Bureau,* 33 F.Supp.2d at 499 (citations omitted).

Finally, web pages often contain links to other web pages called "hyperlinks." A hyperlink is a highlighted portion of text or an image that, when selected or clicked on by the user, permits the user to go directly from the web site he or she is currently viewing to a different web site, without first having to enter the domain name of the new web site. *See Bensusan Restaurant Corp. v. King,* 126 F.3d 25, 27 n. 1 (2d Cir.1997); *Intermatic Inc. v. Toeppen,* 947 F.Supp. 1227, 1232 (N.D.Ill.1996).

### B. *Background and Facts in This Case*

#### 1. *Plaintiffs and "The Buffalo News" Trademark*

Plaintiff OBH is a holding company which owns subsidiaries engaged in a number of diverse business activities. The Buffalo News is an unincorporated division of OBH and publishes a daily and Sunday newspaper in Buffalo, New York under the name *The Buffalo News.*

"The Buffalo News" is a trademark registered on the principal register of the United States Patent and Trademark Office ("PTO"). The mark was registered on December 23, 1980, Registration No. 1,144,143 and pertains to U.S. Class 38 (Prints and Publications) and International Class 16 (Paper Goods and Printed Matter). The mark has been used since November 12, 1977.

Pursuant to a merger with The Buffalo Evening News, Inc., OBH acquired all rights with respect to the "The Buffalo News" trademark. The assignment of the trademark to OBH was recorded with the PTO on May 9, 1988.

In January 1998, OBH assigned the trademark to plaintiff Columbia. The assignment was recorded with the PTO on January 29, 1998. As part of the assignment agreement, OBH acquired an exclusive license for the use of the mark.

Since first acquiring the rights to the mark, OBH has continuously used the mark in connection with the publication of *The Buffalo News* which is distributed daily throughout the Western New York area. OBH has invested substantial sums of money and effort in the development of "The Buffalo News" trademark and built valuable goodwill in the mark. *See* Affidavit of Joseph F. Saeli, Jr., dated Oct. 7, 1999 ("Saeli Aff."), at ¶ 5.

The Buffalo News has operated a web site utilizing the Internet domain name "www.buffnews.com" since approximately 1996. It also currently operates another web site using the domain name "www.buffalo.com," which contains, *inter alia,* an on-line version of *The Buffalo News.*

#### 2. *Defendants and Apartment Spotlight Magazine*

Defendant Tortora is President and founder of defendant Spotlight, which has

been in operation since May 1992. Spotlight owns and operates, for commercial purposes, an apartment rental guide called *Apartment Spotlight Magazine,* which advertises available apartments located throughout Western and Central New York, including apartments located in the cities of Buffalo, Niagara Falls, Rochester and Syracuse. The magazine is distributed free to the general public.[2] Defendants operate on-line versions of *Apartment Spotlight Magazine* at "www.aptspotlight.com" and "www.buffalonyapartments.com."

### 3. *Prior Dispute Between Defendants and The Buffalo News*

The Buffalo News publishes an advertising periodical known as *Apartment Finder,* which is in direct competition with defendants' *Apartment Spotlight Magazine. Id.* at ¶ 16. On or about March 7, 1997, Tortora sent a letter to his advertisers accusing The Buffalo News of copying *Apartment Spotlight Magazine* and alleging that The Buffalo News' *Apartment Finder* was of cheaper and inferior quality. *Id.* at Exhibit H. Tortora states that he sent the letter in order to remain competitive in the marketplace. *See* Affidavit of Claude Tortora, dated Oct. 13, 1999 ("Tortora Aff."), at ¶ 45.

On or about October 29, 1998, Tortora sent The Buffalo News a letter, accusing The Buffalo News of unlawfully copying advertisements from *Apartment Spotlight Magazine* and incorporating such advertisements into The Buffalo News' *Apartment Finder. See id.* at Exhibit J. Tortora claimed that The Buffalo News' actions constituted copyright infringement and that he would pursue legal action if The Buffalo News did not cease and desist. *Id.*

### 4. *Defendants' Creation of "www.thebuffalonews.com" Web Site*

Sometime in early 1999, Tortora became aware that The Buffalo News was operating a web site under the domain name "www.buffnews.com". *Id.* at ¶ 6. Tortora states that, at that time, he decided to set up his own web site to parody and provide a public forum for criticism of The Buffalo News' web site. *Id.* at ¶¶ 7–12.

On March 6, 1999, *Apartment Spotlight Magazine* and Tortora registered the Internet domain name "thebuffalonews.com" with NSI for a $70.00 fee.[3] In April 1999, Tortora began operating a web site using the domain name "www.thebuffalonews.com" (the "Tortora web site"). *Id.* at ¶ 14.

### 5. *Content and Appearance of the Tortora Web Site*

Although the Tortora web site's content and appearance have changed in various ways since it has been in operation, its general, overall appearance and content have remained the same. *Compare id.* at Exhibit A *with id.* at Exhibit E. The site initially welcomes visitors with the greeting "Welcome to www.thebuffalonews.com." *See id.* at Exhibit E. It then includes a disclaimer which reads:

> We are in no way affiliated with or endorsed by THE BUFFALO NEWS, OBH Inc. (formerly Berkshire Hathaway Group) or Columbia Insurance Company. This website operates as a parody and forum for discussion of THE BUFFALO NEWS. This site is and will continue to be parody and forum for discussion of THE BUFFALO NEWS and it is our intention to continue this in support of the expression of first amendment rights of netizens [sic] everywhere.

*Id.*

The Tortora web site contains disparaging comments about The Buffalo News and

---

2. Although not expressly stated, defendants presumably earn money from selling advertising in the magazine and/or from commissions paid by apartment owners who advertise their apartments in the magazine.

3. Defendants also registered the domain names "www.thebuffalonews.org" and "www.thebuffalonews.net."

hyperlinks to other web pages containing negative opinions and stories about The Buffalo News. *Id.* The site invites visitors to submit their own comments and complaints about The Buffalo News via e-mail. *Id.* It states that the purpose of the site is to allow visitors "to gripe" about The Buffalo News and to "affect [sic] some change." *Id.*

The Tortora web site also provides visitors with several hyperlinks to other web sites. For example, it provides hyperlinks to other news-related web sites, including the web sites of other local news sources such as local magazines, newspapers, radio stations and television stations. Like The Buffalo News, these other news sources provide news-related services to consumers throughout the Western New York area.[4]

As of the date the complaint in this case was filed, the Tortora site also contained a hyperlink entitled "Apartments for Rent." This hyperlink connected the user to the web site "www.buffalonyapartments.com," an on-line version of defendants' *Apartment Spotlight Magazine.*[5]

At the end of the Tortora web site is a hyperlink entitled "Legal Disclaimer." *Id.* A user clicking on this hyperlink is sent to a web page containing several disclaimers, including, *inter alia,* a disclaimer that the Tortora web site "is not affiliated in any way, nor sponsored, supported, or endorsed by The Buffalo News." *See* Saeli Aff. at Exhibit D.

The Tortora web site uses script and stylistic features that are very similar, if not identical, to those used by The Buffalo News in its "www.buffalo.com" web site. For example, defendants have copied the stylistic script for the word "Buffalo" and have utilized a skyline motif substantially similar to that used by The Buffalo News

in its web site. *Compare id.* at Exhibit B *with id.* at Exhibit F.

### 6. Tortora's Motive for Using "thebuffalonews.com" as his Domain Name

Tortora's affidavit submitted in opposition to the motion for a preliminary injunction does not expressly state why he chose the domain name "thebuffalonews.com" as opposed to some other domain name. He simply states that after deciding to create a web site critical of The Buffalo News, he discovered that the domain name "thebuffalonews.com" was available and registered it. Tortora Aff. at ¶¶ 6–12. He claims that although he was "obviously" aware of *The Buffalo News* newspaper, he was not aware that the name was a registered trademark. *Id.* at ¶ 10.

At the preliminary injunction hearing, Tortora's counsel contended that Tortora chose "thebuffalonews.com" domain name because it was the only one available. The Court finds this contention disingenuous and contrary to common sense. As stated above, the Internet is growing at a rapid pace and new domain names are being registered all the time. It is inconceivable that defendants could not have come up with a domain name, other than "thebuffalonews.com," that had not already been registered.

The Court infers, based on facts and circumstances present here, along with basic common sense, that Tortora intentionally copied and used "The Buffalo News" trademark as his domain name in the expectation that Internet users looking for The Buffalo News' web site would mistakenly come to his web site where they would encounter negative and disparaging comments about The Buffalo News. In other words, Tortora hoped to trick users into

---

4. At some point, defendants added a hyperlink to The Buffalo News' "www.buffnews.com" web site.

5. After this action was filed, defendants changed the hyperlink that used to go to their

*Apartment Spotlight Magazine* web site. The hyperlink now connects users to the apartment finder section of The Buffalo News' web site.

coming to his web site and receiving his message.

### 7. *Plaintiffs' Reaction*

Plaintiffs eventually became aware that defendants had registered the domain name "thebuffalonews.com." On August 13, 1999, The Buffalo News advised Tortora by letter that "The Buffalo News" was its registered trademark and that it regarded Tortora's use of the domain name "thebuffalonews.com" as an infringement of that trademark. *See* Saeli Aff. at Exhibit A. The Buffalo News warned Tortora that it would take legal action to protect its interests. *Id.*

On August 16, 1999, The Buffalo News wrote Tortora, stating that it was interested in possibly acquiring the domain name from him. *See* Tortora Aff. at Exhibit I. Tortora refused to transfer the domain name, however, and continued to operate his web site at "thebuffalonews.com". *See* Tortora Aff. at ¶ 40.

### 8. *The Instant Action*

On October 6, 1999, after Tortora refused to stop using "thebuffalonews.com" domain name, plaintiffs commenced the instant action, asserting various claims under the Lanham Act, state statutes and the state common law. On October 8, 1999, plaintiffs moved for a preliminary injunction, seeking, *inter alia,* to enjoin defendants from using "thebuffalonews.com" domain name. A hearing on the preliminary injunction motion was held on October 14, 1999. At that time, the Court required the parties to provide further briefing on several issues raised by the Court.

6. The Court notes that, on November 18, 1999, while this case was pending, the Anticybersquatting Consumer Protection Act ("ACPA"), Pub.L. No. 106–113, 15 U.S.C. § 1125(d), was enacted. The Second Circuit has recently held that the ACPA applies retroactively to pending cases. *Sporty's Farm,* 202 F.3d 489, 496. The Court expresses no opinion as to whether plaintiffs would have a viable ACPA claim under the facts of this case. In any event, plaintiffs have not moved

On October 26, 1999, plaintiffs filed an amended complaint, asserting the following causes of action: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114(1); (2) trademark dilution in violation of the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c); (3) false designation of origin, false description and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); (4) trademark infringement and dilution in violation of N.Y.Gen.Bus.Law § 360 *et seq.* and the New York common law; (5) deceptive trade practices in violation of N.Y.Gen-Bus.Law §§ 349 and 350 and the New York common law; and (6) use of a trade name with intent to deceive the public in violation of N.Y.Gen.Bus.Law § 133.[6]

On November 23, 1999, the Court held a second hearing on plaintiffs' motion for a preliminary injunction.[7]

### CONCLUSIONS OF LAW

In cases involving claims of trademark infringement and dilution, as in other types of cases, a party seeking a preliminary injunction must demonstrate: (1) the likelihood of irreparable injury in the absence of such an injunction; and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *See Federal Express Corp. v. Federal Espresso, Inc.,* 201 F.3d 168, 172 (2d Cir. 2000) (citations omitted). In a trademark case, a showing of likelihood of confusion between a plaintiff's mark and a defen-

to amend their complaint to add an ACPA claim. Thus, the Court will not consider such a claim at this time.

7. Neither side asked to call witnesses at the hearing. Thus, the Court's decision is based on the affidavits and exhibits submitted by the parties, a joint stipulation of undisputed facts, and the written submissions and arguments of counsel.

dant's infringing use will establish irreparable harm. *Id.* at 173. Accordingly, the Court will first examine the plaintiffs' likelihood of success on their trademark claims.

## A. *Likelihood of Success on the Merits*

### 1. *Trademark Infringement Claim*

■ Plaintiffs allege that defendants are liable for trademark infringement, pursuant to 15 U.S.C. § 1114, because they are using plaintiffs' registered trademark, without plaintiffs' consent, as the domain name for the Tortora web site. To establish a trademark infringement claim under § 1114, a plaintiff-trademark holder must show defendant's "use in commerce," without plaintiff's consent, of a "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion...." 15 U.S.C. § 1114(1)(a). "To prevail under this statute, the plaintiff must show that it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion." *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 477 (2d Cir.1996) (internal quotations and citations omitted).

The Court finds that plaintiffs have established a likelihood of success on the merits of their § 1114 trademark infringement claim.

### a. *Commerce Requirement*

■ As a threshold matter, defendants argue that § 1114 does not apply in this case because their use of plaintiffs' trademark does not constitute "use in commerce ... in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion...." This argument is really two-fold. The first part of the argument is that defendants' activities do not fall within the jurisdictional purview of the Lanham Act because defendants' use of the mark does not constitute a "use in commerce." The second part of the argument is that defendants' use of the mark does not violate § 1114 because such use is not in connection with any goods or services. The Court finds both arguments without merit.

### (1) *"Use in Commerce"*

Congress's power to register trademarks is derived from the Commerce Clause of the United States Constitution. U.S. Const., Art. I, § 8, cl. 3. The "use in commerce" requirement of the Lanham Act is simply a jurisdictional predicate to any law passed by Congress under the Commerce Clause. The "history and text of the Lanham Act show that 'use in commerce' reflects Congress's intent to legislate to the limits of its authority under the Commerce Clause." *Buti v. Perosa, S.R.L.*, 139 F.3d 98, 102 (2d Cir.1998) (internal quotations and citations omitted), *cert. denied*, 525 U.S. 826, 119 S.Ct. 73, 142 L.Ed.2d 57 (1998). Thus, the scope of term "use in commerce" as a jurisdictional predicate is broad. *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 283, 73 S.Ct. 252, 97 L.Ed. 319 (1952). Indeed, the Lanham Act itself defines "commerce" as "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127.

The Lanham Act defines the term "use in commerce" as, *inter alia*, use of a trademark "on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services." 15 U.S.C. § 1127. The Court finds that the "use in commerce" requirement is met in this case for three reasons.

First, defendants' use of plaintiffs' trademark as the domain name for the Tortora web site constitutes "use in commerce" because that web site contains a hyperlink that connects users to defen-

dants' other web site, the online version of *Apartment Spotlight Magazine*, which they operate for commercial purposes, *i.e.*, advertising apartments for rent.[8] Second, the national, and even international, nature of the Internet itself makes defendants' use of plaintiffs' trademark as a domain name a "use in commerce" for purposes of the Lanham Act. *Planned Parenthood Fed'n of Am., Inc. v. Bucci*, 1997 WL 133313, at *3 (S.D.N.Y. Mar.24, 1997), *aff'd*, 152 F.3d 920 (2d Cir.1998), *cert. denied*, 525 U.S. 834, 119 S.Ct. 90, 142 L.Ed.2d 71 (1998); *Intermatic*, 947 F.Supp. at 1239–40. Finally, as discussed in more detail below, defendants' use of plaintiffs' trademark constitutes a "use in commerce" as it affects plaintiffs' ability to offer their services in commerce. *Planned Parenthood*, 1997 WL 133313, at *3.

In sum, the Court finds that the jurisdictional "use in commerce" requirement is met in this case.

### (2) *"In Connection With" Goods or Services*

The Court further finds that defendants' use of plaintiffs' mark is properly viewed, for § 1114 purposes, as being "in connection with" the distribution or advertising of goods or services. As stated above, the Tortora web site contains a hyperlink that connects users to defendants' other web site, the online version of *Apartment Spotlight Magazine*, on which defendants advertise apartments for rent. Thus, defendants are using plaintiffs' trademark, at least in part, to offer their own services over the Internet.

Further, the "in connection with" requirement is not only met by use of the

mark in connection with goods or services distributed or advertised by the alleged infringer; it may also be met by use in connection with the goods or services distributed by the trademark holder. *See Jews for Jesus*, 993 F.Supp. at 309; *Planned Parenthood*, 1997 WL 133313, at *4. Here, defendants' use of the mark is "in connection with" the distribution or advertising of services, because it is likely to prevent or hinder Internet users from accessing plaintiffs' services on plaintiffs' own web site. *See Jews for Jesus*, 993 F.Supp. at 309; *Planned Parenthood*, 1997 WL 133313, at *4. Prospective users of plaintiffs' services who mistakenly access defendants' web site may fail to continue to search for plaintiffs' web site due to confusion or frustration. Such users, who are presumably looking for the news services provided by the plaintiffs on their web site, may instead opt to select one of the several other news-related hyperlinks contained in defendants' web site. These news-related hyperlinks will directly link the user to other news-related web sites that are in direct competition with plaintiffs in providing news-related services over the Internet. Thus, defendants' action in appropriating plaintiffs' mark has a connection to plaintiffs' distribution of its services.

### b. *Mark Entitled to Protection*

It is undisputed that "The Buffalo News" trademark is registered with the PTO and entitled to protection under the Lanham Act. Registration of the mark constitutes *prima facie* evidence of the validity of the mark and of the registrant's exclusive right to use the mark on the goods and services specified in the regis-

---

**8.** As stated above, after this action was filed, in an apparent attempt to defeat plaintiffs' Lanham Act claims, defendants changed the hyperlink that connected users to defendants' *Apartment Spotlight Magazine* web site. The hyperlink now connects users to the apartment finder section of plaintiffs' web site. Defendants' voluntary cessation of their allegedly unlawful conduct, however, cannot defeat plaintiffs' motion for preliminary injunc-

tion as there is no guarantee that defendants will not simply return to the same conduct if the case is dismissed without issuance of an injunction. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *Desiderio v. National Ass'n of Securities Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir.1999). Thus, the Court will assume that the facts in this case are as they were at the time the action was filed.

tration. *See* 15 U.S.C. §§ 1057(b) and 1115(a). Thus, OBH, having obtained an exclusive license for the use of the mark pursuant to a licensing agreement with the owner of the mark, plaintiff Columbia, has a valid, protectable interest in the mark.

### c. *Likelihood of Confusion*

Once a plaintiff has demonstrated that it has a valid mark, it must then prove that the defendant's use of the mark is likely to cause confusion. Likelihood of confusion is the "key" element a plaintiff must proof in order to succeed on a § 1114 infringement claim. *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir.1993). The issue of likelihood of confusion turns on whether "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." *Id.* To support a finding of infringement, a probability of confusion, not a mere possibility, must exist. *Id.; see also Estee Lauder, Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir.1997).

■ Under the law of this Circuit, when deciding whether a plaintiff has established a likelihood of confusion, courts must consider the eight factors enunciated by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 390–91 (2d Cir.1995); *Gruner + Jahr*, 991 F.2d at 1077. The so-called *Polaroid* factors are: (1) the strength of the plaintiff's mark; (2) the similarity of plaintiff's and defendant's marks; (3) the competitive proximity of their products; (4) the likelihood that plaintiff will "bridge the gap" and offer a product like defendant's; (5) actual confusion between products; (6) defendant's good faith; (7) the quality of defendant's product as compared to plaintiff's; and (8) the sophistication of the purchasers. *Polaroid*, 287 F.2d at 495.

No single *Polaroid* factor is dispositive. *Estee Lauder*, 108 F.3d at 1510; *Arrow Fastener*, 59 F.3d at 400. Instead, each factor must be considered in the context of the others and balanced to determine whether a likelihood of confusion exists. *Plus Prods. v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1004 (2d Cir.1983) (citations omitted).

The list of *Polaroid* factors is not exhaustive; other factors may be added or initial factors abandoned depending on the facts of the particular case. *See Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 743 (2d Cir.1998). Further, the evaluation of the *Polaroid* factors is "not a mechanical process," *Arrow Fastener*, 59 F.3d at 391 (internal quotations and citations omitted), "where the party with the greatest number of factors weighing in its favor wins." *Physicians Formula Cosmetics, Inc. v. West Cabot Cosmetics, Inc.*, 857 F.2d 80, 85 (2d Cir.1988). Rather, a court should focus on the ultimate question of whether consumers are likely to be confused. *See Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 580 (2d Cir. 1991).

Although courts need not "slavishly recite the litany of all eight *Polaroid* factors in each and every case," they must "engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, ... explain why." *See Arrow Fastener*, 59 F.3d at 400 (internal quotations and citations omitted).

■ In addition to requiring consideration of the *Polaroid* factors, the Second Circuit has held that intentional copying of the trademark by the defendant gives rise to a presumption of a likelihood of confusion. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987).

■ Applying the above principles to the instant case, the Court finds that plaintiffs have established, for purposes of their motion for a preliminary injunction, that defendants' use of "The Buffalo News"

trademark is likely to cause consumer confusion. Because, as stated above, the Court has found, as a matter of fact, that defendants intentionally copied plaintiffs' mark, there is a presumption, as a matter of law, that defendants' use of the mark is likely to result in consumer confusion. *See New York State Soc'y of Certified Pub. Accountants v. Eric Louis Assocs., Inc.*, 79 F.Supp.2d 331, 340 (S.D.N.Y. 1999). An analysis of the eight *Polaroid* factors affirms this likelihood of confusion.

### (1) *Strength of Plaintiffs' Mark*

The term "strength" as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods or services sold under the mark as emanating from a particular source. *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 585 (2d Cir.1993) (citation omitted). Here, defendants do not dispute the strength of plaintiffs' mark. "The Buffalo News" mark has been in use since November 1977, has been registered since 1980, and, as the name of a daily newspaper distributed throughout Western New York, is well recognized throughout the marketplace. Thus, the strength of plaintiffs' mark weighs in favor of likelihood of confusion.

### (2) *Degree of Similarity Between the Marks*

The two marks, "The Buffalo News" and "thebuffalonews.com," are, for all intents and purposes, identical; the only distinctions are the latter's lack of initial capitalization, the lack of spaces between the words, and the ".com" that is necessary to designate a domain name. These distinctions are not significant. *See, e.g., Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 184 F.3d 1107, 1110 (finding "epix.com" identical to "EPIX"); *New York State Soc'y of Certified Pub. Accountants*, 79 F.Supp.2d 331, 340 (finding "nysscpa.com" nearly identical to "NYSSCPA"); *Planned Parenthood*, 1997 WL 133313, at *8 (finding "plannedparenthood.com" nearly identical to "Planned Parenthood"). The high degree of similarity between the ·marks weighs in favor of the likelihood of confusion among Internet users.

### (3) *Competitive Proximity of Products or Services*

The web sites of plaintiffs and defendants are both located on the Web. Therefore, defendants' web site at "www.thebuffalonews.com" is close in proximity to plaintiffs' own web site at "www.buffalo.com." Both sites compete for the same audience—namely, Internet users who are searching for a web site that uses plaintiffs' mark as its address. This high degree of competitive proximity increases the likelihood of confusion among Internet users. *Planned Parenthood*, 1997 WL 133313, at *8.

Furthermore, as stated above, defendants' web site at "www.thebuffalonews.com" contains a hyperlink to the online version of defendants' *Apartment Spotlight Magazine. Apartment Spotlight Magazine* is in direct competition with The Buffalo News' *Apartment Finder.* Thus, there is a competitive proximity between the services offered by defendants and the services offered by plaintiffs that is likely to lead to consumer confusion.

### (4) *Likelihood that Plaintiffs Will Bridge the Gap Between the Markets*

The fourth factor looks to whether the plaintiff-trademark holder is likely to enter the market in which the alleged infringer is operating, that is, "bridge the·gap."*New York State Soc'y of Certified Pub. Accountants*, 79 F.Supp.2d 331, 341. Because plaintiffs' web site and defendants' web site are both on the Internet, the parties are vying for users in the same "market." *Planned Parenthood*, 1997 WL 133313, at *8. Where the market for competing goods or services is the same, there is no need to consider whether the plaintiff will bridge the gap between the markets. *Id.* (citing

*Paddington,* 996 F.2d at 586). The Court therefore does not consider this factor in determining the likelihood of confusion.

### (5) *Existence of Actual Confusion*

Plaintiffs have provided no evidence of actual confusion. Thus, this factor provides no support for a finding of a likelihood of confusion. The absence of actual confusion alone, however, is not dispositive of the question of likelihood of confusion. *See Arrow Fastener,* 59 F.3d at 397 (citations omitted).

### (6) *Good Faith*

The sixth factor concerns whether the defendants adopted plaintiffs' mark in good faith. This factor considers "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang,* 949 F.2d at 583 (internal quotations and citations omitted). As stated above, under the circumstances present here, it is clear that defendants adopted the domain name "thebuffalonews.com" for their web site with full knowledge and intent that some Internet users seeking to find plaintiffs' web site would instead be tricked into encountering their web site. While defendants may not have initially been aware that "The Buffalo News" was a registered trademark or have acted under the assumption that their actions were protected by either the First Amendment or their disclaimer, their refusal to discontinue using the mark after plaintiffs sent them the August 13, 1999 letter is evidence that defendants were not acting in good faith. *See New York State Soc'y of Certified Pub. Accountants,* 79 F.Supp.2d 331, 349–50; *see also Nalpac, Ltd. v. Corning Glass Works,* 784 F.2d 752, 755–56 (6th Cir.1986) (exploitation of another's mark after knowledge of its existence suggests bad faith). This conclusion is also supported by the fact that defendants had a running business dispute with plaintiffs and therefore had a motive to harm them.

Further, defendants have failed to offer any credible innocent explanation for their actions. Nor have they offered any evidence that they took affirmative steps, prior to the commencement of this action, such as seeking advice from trademark counsel, to ensure that their conduct would not constitute infringement.

In sum, the Court finds that this factor weighs in favor of a likelihood of confusion. *Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1394 (9th Cir.1993) ("When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public."); *Jews for Jesus,* 993 F.Supp. at 304.

### (7) *Quality of Defendants' Product*

A comparison of the quality of plaintiffs' and defendants' products, *i.e.,* their web sites, is irrelevant in this case; the Court cannot compare the two web sites in terms of superior or inferior quality. However, the Court notes that the two products are obviously different and convey divergent messages. Plaintiffs' web site is basically an on-line version of *The Buffalo News.* The Tortora web site provides negative commentary and disparaging remarks about The Buffalo News. What defendants are doing is using The Buffalo News' own trademark to trick users who are looking for The Buffalo News' web site into encountering negative comments about The Buffalo News. Such conduct is likely to be destructive to the image that The Buffalo News, the senior user of the mark, has established. *Planned Parenthood,* 1997 WL 133313, at *9.

### (8) *Sophistication of the Purchasers*

The eighth *Polaroid* factor is the sophistication of the consumers of the parties' respective services. A finding that the consumers are sophisticated usually militates against a finding of a likelihood of confusion. *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1046–47 (2d Cir.1992). This is not an important

factor in this case, however, because the particular type of confusion caused by defendants' use of the "thebuffalonews.com" domain name afflicts sophisticated Internet users no less than it does unsophisticated users. *See New York State Soc'y of Certified Pub. Accountants*, 79 F.Supp.2d 331, 341; *Planned Parenthood*, 1997 WL 133313, at *9. This type of confusion has been dubbed "initial interest confusion" by the Ninth Circuit, and, because it does not fit neatly within any of the eight *Polaroid* factors, the Court considers it separately below in connection with defendants' disclaimer defense.

In sum, an analysis of defendants' conduct in terms of the eight *Polaroid* factors supports a finding of a likelihood of confusion.

### d. *Disclaimer Defense*

■ Defendants argue that their use of the "thebuffalonews.com" domain name cannot possibly confuse visitors of their web site, because, as detailed above, the site contains disclaimers informing visitors that the site is not affiliated with or endorsed by The Buffalo News or the plaintiffs. The problem with this argument is that it ignores the initial confusion caused by defendants' use of plaintiffs' mark. Internet users entering the "thebuffalonews.com" domain name are expecting to arrive at The Buffalo News' web site. When they arrive instead at defendants' web site, they cannot help being confused—even if only momentarily.

This point was recognized by the court in *Planned Parenthood*, 1997 WL 133313, at *12. In that case, plaintiff was a non-profit, reproductive services organization that owned the rights to the service mark "Planned Parenthood." The plaintiff had facilities throughout the United States and operated an Internet site with the domain name "ppfa.org." The defendant, an out-spoken opponent of the plaintiff, registered

the domain name "plannedparenthood.com." A preliminary injunction was issued after a finding that the domain name and Internet site of the defendant were likely to cause confusion.

In opposing the preliminary injunction, the defendant argued that a disclaimer, rather than a preliminary injunction, would be the appropriate remedy. The court rejected this argument, holding that a "defendant's appropriation of [a] plaintiff's mark as a domain name and home page address cannot adequately be remedied by a disclaimer. [A][d]efendant's domain name and home page address are external labels that, on their face, cause confusion among Internet users and may cause Internet users who seek plaintiff's web site to expend time and energy accessing defendant's web site." *Planned Parenthood*, 1997 WL 133313, at *12; *see also New York State Soc'y of Certified Pub. Accountants*, at 341; *Jews for Jesus*, 993 F.Supp. at 303.

More recently, the Ninth Circuit, in *Brookfield*, 174 F.3d at 1062–63, dubbed this type of confusion "initial interest confusion," and held that a finding of it suffices to establish a likelihood of confusion actionable under the Lanham Act. In *Brookfield*, the defendant used metatags ("moviebuff.com" and "MovieBuff") based on the plaintiff's "MovieBuff" trademark. The court held that

> [a]lthough there is no source confusion in the sense that consumers know they are patronizing [the defendant] rather than [the plaintiff], there is nevertheless initial interest confusion in the sense that, by using "moviebuff.com" or "MovieBuff" to divert people looking for "MovieBuff" to its web site, [defendant] improperly benefits from the goodwill that [plaintiff] developed in its mark.

*Id.* at 1062.[9]

In accordance with these opinions, the Court finds that defendants' use of the

---

9. Although the Second Circuit has not explicitly adopted this rule, the Court notes that the

*Brookfield* court borrowed the concept of initial interest confusion from a Second Circuit

"thebuffalonews.com" domain name causes a likelihood of confusion because it creates initial interest confusion. Having also concluded that plaintiffs' trademark is entitled to protection under the Lanham Act, the Court holds that defendants' actions constitute trademark infringement under 15 U.S.C. § 1114.[10]

### e. *Parody Defense*

■ Defendants also argue that their use of "The Buffalo News" mark is not likely to confuse consumers, because their web site is clearly just a parody of The Buffalo News and its web site. Thus, defendants argue, the average Internet user would not be confused or mislead into believing that their web site is actually a product of The Buffalo News. The Court finds defendants' parody argument without merit.[11]

The Court is not persuaded that the message of defendants' web site constitutes a parody. A parody "depends on a lack of confusion to make its point," and "must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is *not* the original and is instead a parody." *Hormel Foods Corp. v. Jim Henson Prod., Inc.*, 73 F.3d 497, 503 (2d Cir.1996) (internal quotations and citations omitted) (emphasis in original). Defendants' web site does not clearly convey two simultaneous—and contradictory—messages: that it is The Buffalo News web site, but also that it is not The Buffalo News site. The Court finds defendants' web site confusing, at best. For example, the greeting "Welcome to www.thebuffalonews.com" at the top of web site does not

immediately contradict an Internet user's assumption that he or she has accessed the plaintiffs' web site. Only when a user reads through the web site does he or she discover defendants' actual message. Because defendants' web site relies, at least to some extent, on confusion to make its point, defendants' argument that their use of the mark is a parody must fail.

Further, even if defendants' web site, itself, is assumed to be a parody, defendants' use of plaintiffs' mark as the domain name for the site still creates a likelihood of confusion. An Internet user looking for plaintiffs' web site may initially encounter defendants' web site by mistake either by running "The Buffalo News" mark through a search engine or by entering "thebuffalonews.com" as the domain name. The user will not realize that he or she is at the wrong site until he or she reads through defendants' site and discovers that the site is a parody of plaintiffs' site and not the real thing. Thus, even if users will easily recognize, upon reaching defendants' web site, that it is only a parody, the use of plaintiffs' mark as the site's domain name (the external address that users must enter in order to get to the site) creates initial interest confusion, which, as discussed above with regard to the disclaimer defense, is actionable under the Lanham Act.

### 2. *Trademark Dilution Claim*

Plaintiffs also allege that defendants' use of their mark violates the Federal Trademark Dilution Act ("FDTA"), 15 U.S.C. § 1125(c), which provides:

---

case (not involving domain names and metatags) that held that such " 'initial confusion works a sufficient trademark injury.' " *Id.* at 1063 (quoting *Mobil Oil*, 818 F.2d at 260).

**10.** Several previous cases have found infringement where the junior user's conduct consisted of using a domain name formed by simply adding ".com" to the senior user's mark. *See, e.g., New York State Society of Certified Public Accountants*, 79 F.Supp.2d 331, 341–42; *Washington Speakers Bureau*, 33 F.Supp.2d at 504; *Cardservice Int'l, Inc. v.*

*McGee*, 950 F.Supp. 737 (E.D.Va.), *aff'd*, 129 F.3d 1258 (4th Cir.1997); *Planned Parenthood*, 1997 WL 133313, at *12.

**11.** The parody defense and the disclaimer defense are similar defenses. Both rest on the premise that defendants' use of the mark does not create a likelihood of confusion because defendants' web site contains information that clarifies to users that the site is not plaintiffs' web site.

The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark. . . .

15 U.S.C. § 1125(c)(1). Dilution is defined as:

[T]he lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of—(1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception.

15 U.S.C. § 1127. Thus, in order to prevail on a dilution claim, a plaintiff is not required to prove likelihood of confusion. *Federal Express,* 201 F.3d 168, 175. The FTDA is designed

to cover those situations where the public knows that the defendant is not connected to or sponsored by the plaintiff, but the ability of the plaintiff's mark to serve as a unique identifier of the plaintiff's goods or services is weakened because the relevant public now also associates that designation with a new and different source. . . . Thus, where the classic likelihood of confusion test leaves off, the dilution theory begins.

*Id.* (internal quotations and citations omitted); *Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 219 (2d Cir.1999) ("Consumer confusion—the nub of an action for infringement—is, of course, unnecessary to show the actionable dilution of a famous mark.").

██ The FTDA establishes "five necessary elements to a claim of dilution: (1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark." *Nabisco,* 191 F.3d at 215.

In this case, defendants do not dispute elements (1), (2) and (4). They do dispute, however, elements (3) and (5). They argue that their use of plaintiffs' mark does not constitute "commercial use" and therefore cannot be barred by the FTDA. They also argue that their use of the mark does not cause dilution of the mark, because it does not lessen the mark's capacity to identify and distinguish plaintiffs' goods and services. The Court shall address each of these elements *seriatim.*

### a. *"Commercial Use"*

██ 15 U.S.C. § 1125(c)(4)(B) provides that "[n]oncommercial use of a mark" is not actionable under the FTDA. Relying on this section, defendants contend that their conduct is exempt from the FTDA because it constitutes noncommercial speech. They claim that their web site is a parody of The Buffalo News and a place for visitors to voice their opinions and criticisms about The Buffalo News. The Court finds, however, that defendants' use of plaintiffs' mark constitutes a "commercial use" in at least two respects and is therefore actionable under the FTDA.

First, defendants' use of the mark as the domain name for the Tortora web site constitutes a commercial use because, as stated above, that web site contains a hyperlink that connects users to defendants' other web site, the on-line version of *Apartment Spotlight Magazine,* which defendants operate for commercial purposes.

Second, defendants' use of plaintiffs' trademark constitutes a commercial use because defendants' actions are designed to, and do, harm plaintiff commercially. *Planned Parenthood,* 1997 WL 133313, at *5-6. As the court stated in *Planned Parenthood:*

defendant's use is commercial because of its effect on plaintiff's activities. First, defendant has appropriated plaintiff's mark in order to reach an audience of Internet users who want to reach plaintiff's services and viewpoint, intercepting

them and misleading them in an attempt to offer his own political message. Second, defendant's appropriation not only provides Internet users with competing and directly opposing information, but also prevents those users from reaching plaintiff and its services and message. In that way, defendant's use is classically competitive: he has taken plaintiff's mark as his own in order to purvey his Internet services—his web site—to an audience intending to access plaintiff's services.

*Id.* at 6; *see also Jews for Jesus,* 993 F.Supp. at 307–08.

The facts present here are even more compelling than those in *Planned Parenthood.* Prospective users of plaintiffs' news services who mistakenly access defendants' web site may, instead of continuing to look of plaintiffs' web site, opt to select one of the several news-related hyperlinks contained in defendants' web site. These news-related hyperlinks will directly link the user to other news-related web sites that are in direct competition with plaintiffs in providing news-related services over the Internet. Thus, defendants' action in appropriating plaintiffs' mark is likely to have a negative affect on plaintiffs' commercial activities.

In sum, because defendants' use of plaintiffs' mark constitutes a "commercial use," the third element of plaintiffs' FTDA dilution claim is satisfied.

#### b. *Dilution*

"The fifth element [of a FTDA dilution claim]—'dilution of the distinctive quality of the mark'—is the key operative element of the statute." *Nabisco,* 191 F.3d at 216. As stated above, the statute explains that dilution is "the lessening of the capacity of a famous mark to identify and distinguish goods or services." 15 U.S.C. § 1127.

The antidilution statutes rest on a judgment that the stimulant effect of a distinctive and well-known mark is a powerful selling tool that deserves legal protection. This power derives not only from the merit of the goods upon which [the mark] is used, but equally [from the mark's] own uniqueness and singularity. Even when an unauthorized use of the mark does not cause consumer confusion, it can reduce[ ] the public's perception that the mark signifies something unique, singular, or particular. The junior use thereby diminishes the selling power that a distinctive mark or name with favorable associations has engendered for a product in the mind of the consuming public.

*Nabisco,* 191 F.3d at 217 (internal quotations and citations omitted).

The type of dilution pertinent in this case is "blurring,"

a process that may occur where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product. [I]njury to the mark's selling power need not involve any confusion as to source or sponsorship.... [E]xamples of hypothetical violations [include]: DuPont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth.

*Federal Express,* 201 F.3d 168, 174 (internal quotations and citations omitted).

Claims of dilution under the FTDA must be assessed on a case-by-case basis. *Id.* The Second Circuit has recently identified ten nonexclusive factors that may be taken into account in determining whether dilution—particularly of the blurring type—has occurred:

[1] The distinctiveness of the senior mark—both because it is not entitled to protection at all if it is not distinctive, and because the degree of distinctiveness of the senior mark has a considerable bearing on the question whether a junior use will have a diluting effect.
[2] The similarity of the marks—an obvious factor: The marks must be of sufficient similarity so that, in the mind

**194**

of the consumer, the junior mark will conjure an association with the senior [mark, thereby] lessen[ing] the distinctiveness of the senior mark. . . .

[3] The proximity of the products and likelihood of bridging the gap—a less important factor than in infringement suits, because [t]he legislative history of the antidilution statutes shows that the legislatures were largely concerned with junior uses of famous marks on products unrelated to the senior area of commerce—as in the hypothetical cases of Buick aspirin, Schlitz varnish, or Kodak pianos.

[4] The close interdependent relationship among the [three preceding] factors: The weaker any of the three factors may be, the stronger the others must be to make a case of dilution.

[5] [T]he extent of overlap among consumers of the senior user's products and the junior user's products.

[6] The sophistication of the consumers: Courts examining questions of infringement, as well as dilution, have looked at the sophistication of consumers as a relevant factor.

[7] Whether there is actual confusion: While neither actual confusion nor likelihood of confusion is necessary to sustain an action for dilution, it does not follow that actual confusion cannot be highly probative of dilution. Confusion lessens distinction. When consumers confuse the junior mark with the senior, blurring has occurred.

[8] Whether the senior user's mark is in fact descriptive of the junior use: The stronger the adjectival association between the junior use and the junior area of commerce, the less likelihood there is that the junior's use will dilute the strength of the senior's mark.

[9] Whether the senior user acted with reasonable promptness in seeking to protect its mark from the alleged dilution by the junior user, or whether instead there has been a delay such that an injunction will harm the junior user,

*e.g.,* by causing it to lose goodwill built up in the interim.

[10] Whether the senior user has been lax in the past in taking steps to protect its mark against dilution by others.

*Federal Express,* 201 F.3d 168, 175–76 (internal quotations and citations omitted); *see also Nabisco,* 191 F.3d at 217–22.

 Applying the above principles to the instant case, the Court finds that defendants' use of plaintiffs' mark in this case constitutes dilution under the FTDA.

### (1) *Distinctiveness of the Senior Mark*

Defendants do not dispute the distinctiveness of "The Buffalo News" mark. Plaintiffs have been using "The Buffalo News" mark since 1977 as the name of a daily newspaper they distribute throughout the Western New York area. The mark has been registered with the PTO since 1980. Plaintiffs have spent substantial amounts of money and effort developing the mark and have built valuable good will in it. Based on these facts, the Court finds that "the Buffalo News" trademark has at least a reasonable degree of distinctiveness. Thus, this factor favors a finding of dilution.

### (2) *Similarity of Marks*

As stated above with regard to infringement, the two marks, "The Buffalo News" and "thebuffalonews.com," are, for all intents and purposes, identical. Thus, this factor favors a finding of dilution.

### (3) *Proximity of Products and Likelihood of Bridging the Gap*

The web sites of plaintiffs and defendants are both located on the Web. Therefore, defendants' web site at "www.thebuffalonews.com" is close in proximity to plaintiffs' own web site, "www.buffalo.com." Both sites compete for the same audience—namely, Internet users who are searching for a web site that uses plaintiffs' mark as its address.

Furthermore, as stated above, defendants' web site at "www.thebuffalo-news.com" contains a hyperlink to the on-line version of defendants' *Apartment Spotlight Magazine. Apartment Spotlight Magazine* is in direct competition with The Buffalo News' *Apartment Finder.*

Thus, the Court finds that there is a competitive proximity between the services offered by defendants and the services offered by plaintiffs. This factor favors a finding of dilution.

Because plaintiffs' web site and defendants' web site are both on the Internet, the parties are vying for users in the same market. Thus, there is no need to consider whether plaintiffs will bridge the gap between the markets.

#### (4) *Interdependent Relationship Among First Three Factors*

In view of the distinctiveness of plaintiffs' mark, the substantial similarity of the marks, and the fact that plaintiffs and defendants compete for the same audience on the Internet, the Court finds that the interrelationship among the first three factors weighs heavily in favor of a finding of dilution of plaintiffs' mark.

#### (5) *Extent of Overlap Among Consumers*

As stated above, the web sites of plaintiffs and defendants are both located on the Web and compete for the same audience—namely, Internet users who are searching for a web site that uses plaintiffs' mark as its address. Thus, there a complete overlap among consumers. This factor weighs heavily in favor of a finding of dilution.

#### (6) *Sophistication of the Consumers*

As stated above with regard to infringement, this factor—sophistication of the consumers—is not an important factor in this case, because the particular type of confusion caused by defendants' use of the "thebuffalonews.com" domain name afflicts sophisticated Internet users no less than it does unsophisticated users. Internet users entering "thebuffalonews.com" domain name are expecting to arrive at The Buffalo News' web site. When they arrive instead at defendants' web site, they cannot help being at least momentarily confused. All users are susceptible to this "initial interest confusion," whether they are sophisticated or otherwise. *See New York State Soc'y of Certified Pub. Accountants,* 79 F.Supp.2d at 345 (holding that "initial interest confusion" is relevant in a trademark dilution analysis as well as a trademark infringement analysis).

#### (7) *Actual Confusion*

Plaintiffs have provided no evidence of actual confusion. Thus, this factor provides no support for a finding of dilution.

#### (8) *Whether Senior User's Mark is in Fact Descriptive of the Junior Use*

The import of this factor under the facts of this case is unclear. If defendants' use of plaintiffs' mark is viewed as only being related to their web site criticizing The Buffalo News, then the mark does, at least to some extent, describe that use. If, on the other hand, their use is viewed more broadly to include their use of the mark to attract users to the "thebuffalonews.com" web site and then redirect them via a hyperlink to their other commercial web site (the on-line version of *Apartment Spotlight Magazine* ), then the mark does not describe such use.

The Court concludes that this factor should be given little weight here. This is not a case where a junior user is using a senior user's mark as a legitimate description of its product. On the contrary, defendants are intentionally using plaintiffs' mark to trick Internet users into visiting defendants' web site by making them believe that they are actually accessing plaintiffs' web site.

#### (9) *Whether the Senior User Acted With Reasonable Promptness to Protect its Mark*

Defendants began using plaintiffs' mark as the domain name for their web site in April 1999. Plaintiffs claim that they did become aware of defendants' use of the mark until August 1999. Defendants have offered no evidence to dispute plaintiffs' claim; they have offered only conjecture that plaintiffs should have known of the use earlier. As soon as plaintiffs discovered defendants' use of the mark, they sent defendants a letter notifying defendants that their use of the mark constituted a trademark violation. When defendants refused to stop using the mark, plaintiffs brought this action in October 1999. Based on these facts, the Court finds, despite defendants' argument to the contrary, that plaintiffs acted with reasonable promptness to protect their mark from defendants' alleged dilution. *See New York State Soc'y of Certified Pub. Accountants*, 79 F.Supp.2d at 344 (holding that, although plaintiff did not indicate the exact date on which it first learned of the defendant's use of the mark, plaintiff acted with reasonable promptness because initial cease and desist demand was made less than four months after defendant began using the mark).

#### (10) *Whether Senior User Has Been Lax in the Past in Protecting its Mark*

There has been no evidence on this issue presented by either side. Thus, this factor shall play no role in the Court's determination.

In sum, after considering all the dilution factors identified by the Second Circuit in *Federal Express* and *Nabisco*, together with all the facts and circumstances of this case, the Court finds that defendants' use of plaintiffs' "The Buffalo News" trademark constitutes dilution of that mark under the FTDA as it lessens the mark's capacity to identify and distinguish plaintiffs' goods and services, in particular, but not exclusively, plaintiffs' own web site. Plaintiffs have therefore satisfied the fifth and final element of their FTDA dilution claim.

Having satisfied all five necessary elements, the Court finds that plaintiffs have demonstrated a likelihood of success on their FTDA dilution claim.

#### 3. *Unfair Competition Claim*

In addition to their trademark infringement claim under 15 U.S.C. § 1114 and their trademark dilution claim under the FTDA, plaintiffs assert a claim of unfair competition under 15 U.S.C. § 1125(a)(1)(A). Section 1125(a)(1)(A) deems liable for false designation of origin

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion....

Section 1125(a)(1)(A) prohibits conduct similar to the conduct prohibited by § 1114, but is not limited to the uses of registered trademarks. As in an action alleging infringement of a registered mark under § 1114, "likelihood of confusion is the essence of an unfair competition claim" under § 1125(a)(1)(A). *Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595, 604 (6th Cir.1991). Thus, the same likelihood-of-confusion factors considered under § 1114 are considered under § 1125(a)(1)(A). *Id.* Accordingly, having established a likelihood of confusion on their § 1114 infringement claim, plaintiffs have similarly established a likelihood of confusion on their § 1125(a)(1)(A) unfair competition claim.

Unlike § 1114, § 1125(a)(1)(A) is limited by § 1125(c)(4)(B), which provides that "[n]oncommercial use of a mark" is not actionable under § 1125. *See Planned Parenthood*, 1997 WL 133313, at *4, *7.

The Court has already found, with respect to plaintiffs' FTDA dilution claim, that defendants' use of plaintiffs' mark constitutes a commercial use actionable under § 1125. Thus, the commercial use requirement for a § 1125(a)(1)(A) unfair competition claim is satisfied.

In sum, given that plaintiffs have established a likelihood of success on the merits of both their § 1114 infringement claim and their FTDA dilution claim, it follows that they have likewise established a likelihood of success on the merits on their § 1125(a)(1)(A) unfair competition claim.[12]

### 4. First Amendment Defense

Defendants argue that their use of "The Buffalo News" mark as the domain name for their web site is protected by the First Amendment. The Court finds this argument unpersuasive.

■■■ "Domain names ... *per se* are neither automatically entitled to nor excluded from the protections of the First Amendment, and the appropriate inquiry is one that fully addresses particular circumstances presented with respect to each domain name." *Name.Space*, 202 F.3d 573, 585. Whether a particular domain name is entitled to protection under the First Amendment depends on the extent of its communicative message. *Id.*

In *Planned Parenthood*, the court held that the defendant's particular use of the domain name "plannedparenthood.com" to identify his web site acted as a "source identifier" rather than a "communicative message" and therefore was not entitled to First Amendment protection. *Planned Parenthood*, 1997 WL 133313, at *10. The court left open the possibility that a domain name could constitute such a message under other circumstances.

In *Name.Space*, 202 F.3d 573, 585, the Second Circuit recently approved the *Planned Parenthood* court's First Amend-

ment analysis. The Second Circuit held that when determining the communicative aspects of a domain name, a court should conduct a "particularistic, context-sensitive analysis ..., including analyses of the domain name itself, the way the domain name is being used, the motivations of the author of the website in question, [and] the contents of the website...." *Id.*

■■■ Applying the above principles to the instant case, the Court finds that defendants' use of "The Buffalo News" trademark as the domain name for their web site is not protected by the First Amendment. Plaintiffs do not seek, in any way, to restrain defendants from speech that criticizes The Buffalo News. The sole purpose of the Court's inquiry is to determine whether the use of the "The Buffalo News" mark as defendants' domain name for their web site constitutes an infringement of plaintiffs' trademark. Had defendants used a domain name other than plaintiffs' trademark, there would be little question that the content of their web site would be protected by the First Amendment (assuming of course it is not libelous or slanderous) and that plaintiffs would have no recourse under the trademark law to prevent defendants' conduct. For example, had defendant Tortora used a domain name such as "claudetortora.com" or some derivative thereof, plaintiffs could not use the trademark laws to prevent him from criticizing The Buffalo News on his web site.

Instead, however, defendants chose to use plaintiffs' mark as their domain name in order to deceive Internet users into believing that they were accessing plaintiffs' web site. Such a use of plaintiffs' mark is not protected by the First Amendment. Use of another's trademark is entitled to First Amendment protection only when the use of that mark is part of a communicative message, not when it is

---

**12.** In view of the Court's finding that plaintiffs have demonstrated a likelihood of success on the merits of their federal trademark claims, the Court need not address plaintiffs' state law claims.

used merely to identify the source of a product. *Planned Parenthood,* 1997 WL 133313, at \*10 (citing *Yankee Publishing, Inc. v. News Am. Publishing, Inc.,* 809 F.Supp. 267, 275 (S.D.N.Y.1992)).

> When another's trademark ... is used without permission for the purpose of source identification, the trademark law generally prevails over the First Amendment. Free speech rights do not extend to labeling or advertising products in a manner that conflicts with the trademark rights of others.

*Id.* at 586 (internal quotations and citation omitted).

Here, defendants' use of plaintiffs' mark as the domain name for their web site is, on its face, more analogous to source identification than to a communicative message; in essence, the name identifies the web site as being the product, or forum, of the plaintiffs. Defendants offer no argument as to why the Court should determine that their use of "thebuffalonews.com" is a communicative message rather than a source identifier. Accordingly, because defendants' use of the term "The Buffalo News" is not part of a communicative message, their infringement of plaintiffs' mark is not protected by the First Amendment.[13]

## B. *Irreparable Harm*

Because plaintiffs have demonstrated a likelihood of success on the merits of their trademark infringement claims, the Court presumes that they will suffer irreparable harm if defendants are not enjoined. *See Federal Express,* 201 F.3d 168, 173 ("proof of a likelihood of confusion ... create[s] a presumption of irreparable harm, and thus a plaintiff would not need to prove such harm independently").

## CONCLUSION

For the reasons stated, the Court grants plaintiffs' motion for a preliminary injunction and it is hereby

**ORDERED** that defendants shall immediately take whatever steps necessary, at their own expense, to cease and desist from using the domain names "www.thebuffalonews.com," "www.thebuffalonews.org," and "www.thebuffalonews.net" as the web site addresses for any web sites operated by defendants on the World Wide Web, and it is further

**ORDERED** that defendants, their officers, agents, servants, employees, representatives, and attorneys, and all other persons in active concert or participation with them are prohibited and enjoined from representing by any means whatsoever that defendants, or any products or services offered by defendants, including information services provided via defendants' web site or the Internet, are associated in any way with plaintiffs or their products or services, and from taking other action likely to cause confusion or mistake on the part of Internet users or consumers; and it is further

**ORDERED** that any remaining relief sought by plaintiffs shall be the subject of further proceedings herein.

IT IS SO ORDERED.

---

**13.** There may be instances where a domain name uses a trademark in such a way that it is part of a communicative message. *See, e.g., Bally Total Fitness Holding Corp. v. Faber,* 29 F.Supp.2d 1161, 1167 (C.D.Cal.1998) (finding that defendant's use of the term "ballysucks" as part of his domain name was protected by First Amendment in trademark action brought by "Bally" trademark holder).