**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 29, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UTAH LIGHTHOUSE MINISTRY, a
Utah corporation,

      Plaintiff-Counter-Defendant -
Appellant,

v.

FOUNDATION FOR APOLOGETIC
INFORMATION AND RESEARCH,
(FAIR), a New York corporation;
SCOTT GORDON,

      Defendants - Appellees,

DISCOVERY COMPUTING, an
Arizona corporation; ALLEN L.
WYATT, an individual,

      Defendants-Counter-
Claimants - Appellees.

No. 07-4095

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:05-CV-00380-DAK)**

---

Paul C. Oestreich, Morriss, O'Bryant Compagni, P.C., Salt Lake City, Utah,
appearing for Plaintiff-Appellant.

Lance C. Starr, American Fork, Utah, appearing for Defendants-Appellees
Discovery Computing, Inc. and Allen Wyatt. D. Miles Holman (Jeffrey N. Walker
with him on the brief), Holman & Walker, L.C., Sandy, Utah, appearing for

Defendants-Appellees Foundation for Apologetic Information & Research and Scott Gordon.

---

Before **TYMKOVICH** and **GORSUCH**, Circuit Judges, and **PARKER**, District Judge.[*]

---

**PARKER**, District Judge.

---

Utah Lighthouse Ministry (UTLM) appeals from a decision of the district court granting Defendants' motion for summary judgment on UTLM's claims of trademark infringement, unfair competition, and cybersquatting.

## I. BACKGROUND

### A. Facts

Jerald and Sandra Tanner founded UTLM in 1982 to critique the Church of Jesus Christ of Latter-day Saints (LDS Church). In support of its mission, UTLM sells books at both a brick-and-mortar bookstore in Utah and through an online bookstore at the official UTLM website, www.utlm.org.

The Foundation for Apologetic Information and Research (FAIR) is a volunteer organization that responds to criticisms of the LDS Church. FAIR's

---

[*] The Honorable James A. Parker, Senior District Judge, United States District Court for the District of New Mexico, sitting by designation.

website also has an online bookstore, and both FAIR and UTLM provide online publications on the subject of the LDS Church. The publications in the two bookstores overlap by thirty titles. Defendant-Appellee Allen Wyatt is the vice president and webmaster for FAIR. In November 2003, Wyatt created a website parodying the UTLM website—the Wyatt website is similar in appearance but has different, though suggestively parallel, content.

The district court's Memorandum Decision and Order describes the design and content of the Wyatt and UTLM websites (Mem. Decision & Order at 3–4), and Appellant's appendix includes screen shots of the websites. The design elements are similar, including the image of a lighthouse with black and white barbershop stripes. However, the words "Destroy, Mislead, and Deceive" are written across the stripes on the Wyatt website. Prominent text on the Wyatt website consists of a slight modification of the language located in the same position on the UTLM website. For example, the UTLM website states: "Welcome to the Official Website of the Utah Lighthouse Ministry, founded by Jerald and Sandra Tanner." In comparison, the Wyatt website states: "Welcome to an official website *about* the Utah Lighthouse Ministry, *which was* founded by Jerald and Sandra Tanner." (emphasis added.) The Wyatt website does not have any kind of disclaimer that it is not associated with UTLM.

The Wyatt website contains no advertising and offers no goods or services for sale. The Wyatt website includes sixteen external hyperlinks. Eleven of these

hyperlinks point to the website of an organization at Brigham Young University. Three hyperlinks point to articles on the FAIR website that are critical of the Tanners, and another takes viewers directly to the FAIR homepage. The other external hyperlink is to the website of the LDS Church.

Wyatt, through his company Discovery Computing, Inc., registered ten domain names, each of which directed visitors to the Wyatt website. The domain names are combinations of "Utah Lighthouse Ministry," "Sandra Tanner," "Gerald Tanner," "Jerald Tanner," and ".com" and ".org." Wyatt first publicized the Wyatt website to FAIR members in April 2004. Defendants assert that prior to April 2004 only Wyatt had any knowledge of or input into the website.

Wyatt ceased operation of the website and began to transfer the domain names to UTLM in April 2005.

## B. Procedural History

UTLM's complaint made six claims for relief: (1) trademark infringement, 15 U.S.C. § 1125(a); (2) unfair competition, *id.*; (3) unfair competition under Utah law, Utah Code Ann. § 13-5a-101 to -103 (2008); (4) trademark dilution, 15 U.S.C. § 1125(c); (5) cybersquatting, *id.* § 1125(d); and (6) trade dress infringement, *id.* § 1125(a). The parties filed cross-motions for summary judgment, and the district court judge denied Plaintiff's motion and granted Defendants' motion on all six counts. UTLM appeals only the district court's

-4-

ruling on the trademark infringement, unfair competition, and cybersquatting claims.[1] Furthermore, UTLM appeals with regard to only one of its trademarks, UTAH LIGHTHOUSE.

## II. DISCUSSION

### A. Standard of Review

We review a district court's grant of summary judgment *de novo*, and apply the same legal standard as the district court. *MediaNews Group, Inc. v. McCarthey*, 494 F.3d 1254, 1260 (10th Cir. 2007). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We consider the factual record, together with all reasonable inferences derived therefrom, in the light most favorable to the nonmoving party and we do not weigh the evidence or make credibility determinations. *Jones v. Barnhart*, 349 F.3d 1260, 1265 (10th Cir. 2003).

---

[1]Appellant's statement of the case asserts that it is appealing all except the dilution claim, but Appellant's opening brief does not present argument on the state unfair competition and trade dress infringement claims. Arguments inadequately briefed in the opening brief are waived. *Adler v. Wal-Mart Stores*, 144 F.3d 664, 679 (10th Cir. 1998).

**B. Trademark Infringement and Unfair Competition**

Trademark infringement is a type of unfair competition; the two claims have virtually identical elements and are properly addressed together as an action brought under 15 U.S.C. § 1125(a)(1)(B), commonly known as section 43 of the Lanham Act. *See Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1219 (10th Cir. 2004); *cf. Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *Heaton Distrib. Co. v. Union Tank Car Co.*, 387 F.2d 477 (8th Cir. 1967) ("Trademark infringement is but part of broader law of unfair competition; and facts supporting suit for infringement and one for unfair competition are substantially identical.").

Because UTLM's trademark, UTAH LIGHTHOUSE, was not registered at the time Allen Wyatt created the Wyatt website in November 2003,[2] UTLM must show that the mark is protectable. *See Two Pesos*, 505 U.S. at 768; *Donchez*, 392 F.3d at 1215. In addition, UTLM must demonstrate that Defendants used the trademark "in connection with any goods or services." 15 U.S.C. § 1125(a)(1). Finally, UTLM must establish that Defendants' use "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval

---

[2]UTLM registered the mark on July 25, 2006. (Appellant's App. at 162.)

of his or her goods, services, or commercial activities by another person." *Id.* § 1125(a)(1)(A).

The district court found that the mark UTAH LIGHTHOUSE was not protectable, that the Defendants' use of the mark was not commercial, and that there was no likelihood of confusion—in other words, that none of the three requirements for a trademark infringement claim were satisfied.

## 1. Protectability

UTLM argued to the district court that the mark UTAH LIGHTHOUSE was entitled to a presumption of protectability because it is a registered mark. (Appellees' Suppl. App. at 25.) The district court rejected this argument on the ground that UTAH LIGHTHOUSE was not registered at the time the lawsuit was filed, and therefore is not entitled to a presumption of validity under 15 U.S.C. § 1115(a).[3] (Mem. Decision & Order at 14.) Second, the district court held that UTLM had failed to show that any of its trademarks had acquired secondary meaning. (*Id.*)

UTLM contends that the district court should have applied the test for trademark distinctiveness stated in *Donchez v. Coors Brewing Co.*, 392 F.3d 1211

---

[3]It is not clear that a mark must be registered at the time the suit is filed to benefit from the statutory presumption, but it is not necessary to decide that issue on this appeal.

(10th Cir. 2004). Under the *Donchez* approach, there are five categories of marks: generic, descriptive, suggestive, arbitrary, and fanciful. *Id.* at 1216 (*quoting Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999)). The category into which a mark falls determines both its "eligibility for protection and the degree of protection accorded." *Id.* Generic and descriptive marks are not inherently distinctive and therefore require a showing of secondary meaning—that is, that the consuming public has come to view these marks as distinctive. UTLM argues on appeal that UTAH LIGHTHOUSE is distinctive because it is arbitrary and therefore no showing of secondary meaning is required. However, UTLM did not raise this argument below. Instead it relied on the post-complaint registration of UTAH LIGHTHOUSE to argue that it was entitled to a statutory presumption of protectability. Though the court of appeals has discretion to consider arguments raised for the first time on appeal, *Singleton v. Wulff*, 428 U.S. 106, 121 (1976), we decline to do so in this case. *See Cummings v. Norton*, 393 F.3d 1186, 1191 (10th Cir. 2005); *Tele-Commc'ns, Inc. v. Comm'r*, 104 F.3d 1229, 1232–33 (10th Cir. 1997) ("an issue must be presented to, considered [and] decided by the trial court before it can be raised on appeal").

One could construe UTLM's arguments to the district court as asserting that UTAH LIGHTHOUSE had acquired secondary meaning, based on the evidence that UTLM presented on the prevalence of the UTAH LIGHTHOUSE trademark on the Internet. This evidence took the form of the number of "hits"

-8-

generated by searches for UTAH LIGHTHOUSE on the Yahoo and Google search engines and on the websites of other organizations associated with the LDS Church. (*See* Appellant's App. at 27–28.) A mark acquires a secondary meaning if the words "have been used so long and so exclusively by one producer with reference to his goods or articles that, in that trade and to that branch of the purchasing public, the word or phrase [has] come to mean that the article is his product." *Educ. Dev. Corp. v. Econ. Co.*, 562 F.2d 26, 29–30 (10th Cir. 1977) (internal quotation marks omitted) (modification in original). The number of search engine hits, standing alone, is inadequate to demonstrate that consumers associate the mark with a particular product or producer, or perceive UTAH LIGHTHOUSE as a distinctive mark. In a recent decision, we noted that the mere fact that Ski Magazine had repeatedly ranked the Vail Ski Resort as a preeminent ski resort over the last twenty years was ineffective evidence of the secondary meaning of the descriptive term "Vail." *Vail Assocs. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 867 n.12 (10th Cir. 2008). Such evidence would have been more probative of consumer perceptions if the plaintiff had also presented "evidence as to the circulation of Ski Magazine, the regard in which likely consumers of [the plaintiff's] services hold the magazine, or the percentage of those consumers that read the magazine." *Id.* Likewise, in this case the number of search engine "hits" would support UTLM's claim of secondary meaning only if accompanied by some kind of evidence that the relevant market of consumers has visited the websites

containing these hits. Therefore, we conclude that UTLM failed to present sufficient evidence to enable a reasonable jury to find that the UTAH LIGHTHOUSE mark had acquired a secondary meaning.

## 2. Commercial Use

To invoke the protections of the Lanham Act, a plaintiff must show that the alleged infringer used the plaintiff's mark "in connection with any goods or services."[4] 15 U.S.C. § 1125(a)(1); *cf. Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005). This is commonly described as the commercial use requirement.

UTLM asserts that Wyatt's use was commercial on three grounds. First, that the Wyatt website hyperlinked to a website that sells goods—the FAIR website. Second, that the Wyatt website interferes with the ability of users to reach the goods and services offered on the UTLM website. Third, that the overall commercial nature of the Internet renders the website itself a commercial use.

---

[4]UTLM argues that it must show that Defendants' use is "in commerce." The Ninth Circuit has noted that the statutory phrase "use in commerce" is only a requirement for Congress to enact legislation concerning trademarks. *See Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005). However, a defendant is liable under 15 U.S.C. § 1125(a) only for uses "in connection with any goods or services." In a trademark infringement claim based on a registered trademark, under 15 U.S.C. § 1114, which was at issue in *Bosley*, the plaintiff must show that the use was "in connection with the sale, offering for sale, distribution, or advertising of any goods or services."

UTLM's first argument is that the Wyatt website became commercial because it hyperlinked to the FAIR website, which contains an online bookstore. Several circuit courts of appeals, but not the Tenth Circuit, have confronted the issue of when hyperlinking renders an otherwise noncommercial website subject to the Lanham Act. *See, e.g.*, *Bosley Med. Inst.*, 403 F.3d 672 (finding a sequence of links to advertising too attenuated to constitute commercial use); *Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003) (concluding that a site was commercial because it contained hyperlinks to two commercial websites, even though the links were "extremely minimal"); *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359 (4th Cir. 2001) (holding that a website which linked to thirty commercial operators was itself commercial); *see also OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176, 185–86 (W.D.N.Y. 2000).

The most significant and analogous of these cases is the Ninth Circuit's decision in *Bosley Medical Institute v. Kremer*. In *Bosley*, the defendant was dissatisfied with a hair implant procedure he had received from Bosley Medical and created a website with the domain name "bosleymedical.com" to post negative information about Bosley Medical. The website linked to another website also maintained by the defendant, which in turn linked to a newsgroup, *alt.baldspot*, which contained advertisements for Bosley Medical's competitors. The Ninth Circuit affirmed the district court's ruling that the defendant's use was not in connection with the sale of goods or services because the link to Bosley

-11-

Medical's competitors was too roundabout and attenuated. 403 F.3d at 677.

In this case, the district court held that the Wyatt website was not a commercial use because it "provided no goods or services, earned no revenue, and had no direct links to any commercial sites." (Mem. Decision & Order at 11.) The district court's holding was consistent with the fact-sensitive, case-by-case assessment that the Ninth Circuit utilized in *Bosley*, and that we believe is appropriate.

The Lanham Act is intended "to protect the ability of consumers to distinguish among competing producers," *Two Pesos*, 505 U.S. at 774, not to prevent all unauthorized uses. The First and Ninth Circuits have emphasized that trademark rights cannot be used "to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view." *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 29 (1st Cir. 1987); *Bosley*, 403 F.3d at 675. Like in *Bosley*, Wyatt used UTLM's trademark "not in connection with a sale of goods or services—[but] in connection with the expression of his opinion about [UTLM's] goods and services." *Bosley*, 403 F.3d at 679. In both *Bosley* and this case, the offending websites offered critical commentary about the trademark owner, and the use of the trademark was separated from any goods or services offered for sale. The Wyatt website links to three articles on the FAIR website and to the FAIR homepage, but not directly to the FAIR bookstore. The FAIR homepage is overwhelmingly noncommercial in nature, and contains only an

inconspicuous link to the FAIR online bookstore. (Appellant's App. at 1.) In a situation like this, the "roundabout path" to the advertising or commercial use of others is simply "too attenuated." *Bosley*, 403 F.3d at 679.

UTLM's second argument is that the Wyatt website prevents users from accessing both UTLM's ideological services and the books for sale through the online bookstore. The Fourth Circuit recognized this kind of competition in *People for the Ethical Treatment of Animals (PETA) v. Doughney*, 263 F.3d 359 (4th Cir. 2001), in which the defendant had created a website with the domain name "peta.org" that promoted carnivorous behavior[5]—an idea antithetical to the animal rights agenda promoted by PETA. The defendant's website contained hyperlinks to over thirty commercial operators. *Id.* at 366. The Fourth Circuit held that these links made the defendant's use of PETA's mark commercial. However, the court also held that the defendant "need not have actually sold or advertised goods or services" but "need only have prevented users from obtaining or using PETA's goods or services."[6] *Id.* at 365.

---

[5]On the defendant's website, the acronym "PETA" stood for "People Eating Tasty Animals." 263 F.3d at 362.

[6]The Fourth Circuit cited two district court decisions that had taken a similar approach. *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176, 183 (W.D.N.Y. 2000) (website parodying the Buffalo News under the domain name "thebuffalonews.com" was commercial because the website was "likely to prevent or hinder Internet users from accessing plaintiffs' services on plaintiffs' own web site"); *Planned Parenthood Fed'n of Am., Inc. v. Bucci*, 1997 WL 133313, at *3 (S.D.N.Y. Mar. 24, 1997), *aff'd*, 152 F.3d 920 (2d Cir. 1998) (finding a website

-13-

Likewise, UTLM argues that the use of a trademark is within the scope of the Lanham Act if the use is in connection with the *trademark owner*'s sale of goods or services. Such an interpretation eliminates the requirement of an economic competitor and is therefore inconsistent with the purpose of the Lanham Act "to protect the ability of consumers to distinguish among competing producers." *Two Pesos*, 505 U.S. at 774 (*quoting Park 'n Fly v. Dollar Park & Fly*, 469 U.S. 189, 198 (1985)). The "interference" theory has also been criticized on the ground that it would "place most critical, otherwise protected consumer commentary under the restrictions of the Lanham Act." *See Bosley*, 403 F.3d at 679. In our view, the defendant in a trademark infringement and unfair competition case must use the mark in connection with the goods or services of a competing producer, not merely to make a comment on the trademark owner's goods or services. The Lanham Act addresses the specific problem of consumer confusion about the source of goods and services created by the unauthorized use of trademarks. *See Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368 (1924) ("A trademark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his.") Unless there is a competing good or service labeled or associated with the plaintiff's trademark, the

criticizing Planned Parenthood policies and using the domain name "plannedparenthood.com" was commercial because it would frustrate users and prevent them from reaching the Planned Parenthood website).

-14-

concerns of the Lanham Act are not invoked. *See Lang v. Ret. Living Publ'g Co., Inc.*, 949 F.2d 576, 582–83 (2nd Cir. 1991) ("[T]he Lanham Act seeks to prevent consumer confusion that enables a seller to pass off his goods as the goods of another . . . . [T]rademark infringement protects only against mistaken purchasing decisions and not against confusion generally.") (internal quotations and citations omitted).

UTLM's third argument is that the "broad scope and wide commercial use of the Internet itself" makes Defendants' use of UTLM's trademark as a domain name a commercial use for purposes of the Lanham Act. (Appellant's Amended Opening Brief at 24.) UTLM notes that several district courts have adopted this view, but mischaracterizes the holdings of these courts. (*Id.* (*citing OBH*, 86 F. Supp. 2d at 186; *Planned Parenthood Fed'n of Am.*, 1997 WL 133313, at *3; *Intermatic Inc. v. Toeppen*, 947 F. Supp. 1227, 1239–40 (N.D. Ill. 1996)).) It is important to distinguish between the merely jurisdictional "in commerce" requirement, *see* 15 U.S.C. § 1127, and the "in connection with any goods and services" requirement that establishes a violation of section 43 of the Lanham Act. *See Bosley*, 403 F.3d at 677. All three of the district court decisions that UTLM cites held that the use of a trademark on the Internet satisfies only the jurisdictional requirement. These courts concluded that each defendant's use of the trademark was in connection with goods and services, but based on facts other than the mere use of the Internet. We agree that the Internet is generally an

instrumentality of interstate commerce, *see United States v. Schaefer*, 501 F.3d 1197, 1201 & n.8 (10th Cir. 2007), and thus that the jurisdiction of the Lanham Act constitutionally extends to unauthorized uses of trademarks on the Internet.[7] However, this does not mean that any use of the Internet is necessarily commercial for the purposes of the Lanham Act, as UTLM advocates. Moreover, conflating these two "commerce" requirements would greatly expand the scope of the Lanham Act to encompass objectively noncommercial speech. We therefore decline to adopt UTLM's proposed rule that any use of a trademark on the Internet is a use "in connection with goods or services."

Defendants' use of UTLM's trademark, UTAH LIGHTHOUSE, is not in connection with any goods or services, and therefore the district court properly granted summary judgment on UTLM's trademark infringement and unfair competition claims.


### 3. Likelihood of Confusion

Even if Defendants' use were determined to be commercial, it would only infringe upon UTLM's trademark rights if the use created a likelihood of

---

[7]Congress defined commerce for the purposes of the Lanham Act as "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. We recently noted that where Congress indicates that it intends to exercise its full Commerce Clause powers, we will be more inclined to find that use of the Internet involves interstate commerce. *Schaefer*, 501 F.3d at 1201–02; *see also United States v. Vigil*, Cr. No. 07-2060, at 15 (10th Cir. Apr. 29, 2008).

confusion. 15 U.S.C. § 1125(a)(1)(A). The party alleging infringement has the burden of proving likelihood of confusion. *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1238–39 (10th Cir. 2006). Though likelihood of confusion is a question of fact, it is amenable to summary judgment in that "[c]ourts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion." *Universal Money Ctrs. v. AT&T*, 22 F.3d 1527, 1530 n.2 (10th Cir. 1994) (*quoting Warner Bros. v. Am. Broad. Cos.*, 720 F.2d 231, 246 (2d Cir. 1983)).

Likelihood of confusion is typically evaluated according to a six-factor test in which the court considers: (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in using the mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks. *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964 (10th Cir. 2002). No one factor is dispositive. The district court found that there was no likelihood of confusion based on its analysis of these six factors and its determination that the Wyatt website was a parody of the UTLM website. (Mem. Decision & Order at 21.) Parody is another factor to consider in determining the likelihood of confusion, and casts several of the above-cited six factors in a different light. For instance, Defendants do not dispute that the marks are similar, and Wyatt

admitted that he intentionally selected the Utah Lighthouse domain name on the basis that it "seemed like a good name to use . . . [to] refute or provide criticisms about the Tanners." (Appellant's App. at 20 (Wyatt Dep. at 15–16)). Evidence that the alleged infringer chose a mark with the intent to copy, rather than randomly or by accident, typically supports an inference of likelihood of confusion. *Sally Beauty Co.*, 304 F.3d at 973; *see, e.g.*, *Planned Parenthood Fed'n of Am., Inc.*, 1997 WL 133313, at *3 (finding that defendant used plaintiff's trademark to intentionally divert Internet traffic to his own websites); *Jews for Jesus v. Brodsky*, 993 F. Supp. 282, 304 (D.N.J. 1998) (same). Wyatt counters that the inference arises only if the defendant intended to benefit from the reputation or goodwill of the trademark owner, *see Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1485 (10th Cir. 1987), and that he could not be intending to benefit from UTLM's goodwill since he was criticizing UTLM. A critical parody nevertheless "derive[s] benefit from the reputation of the owner of the mark . . . [in that] no parody could be made without the initial mark." *Id.* at 1486 (citations omitted). What is critical is that the benefit "arises from the humorous association, not from public confusion as to the source of the marks," *id.*, so no inference of confusion can be drawn from the intentional use simply as a parody.

Evidence of actual confusion is not necessary to show a likelihood of confusion, but it is the "best evidence of a likelihood of confusion in the

marketplace." *Standard Oil Co. v. Standard Oil Co.*, 252 F.2d 65, 74 (10th Cir. 1958). The district court found that there was no evidence of actual confusion. (Mem. Decision & Opinion at 21.) While it appears that UTLM proffered some weak evidence of actual confusion,[8] the district court did not err in finding that this factor weighs in favor of the Defendants.

The fourth factor, the similarity in goods and services offered and in the manner of marketing, is difficult to apply in this case because of the attenuation between the use of the trademark and the goods offered for sale. This illustrates the problems with a more expansive interpretation of the commercial use requirement urged by UTLM. It is true that UTLM and FAIR both operate online bookstores and sell overlapping sets of book titles. However, any potential for confusion created by the similarity in goods and manner of marketing is mitigated by the lengthy path a consumer must take to reach the goods offered for sale. The FAIR bookstore does not use UTLM's trademark, and a searcher must click through a website that does not resemble the UTLM website in order to reach FAIR's bookstore.

The fifth factor is the degree of care typically exercised by purchasers of

---

[8]When Wyatt sent a link to the Wyatt website to the FAIR listserve, one FAIR member, Michelle Carnohan, asked, "whose site is this?" UTLM contends that this shows actual confusion, while Defendants counter that it is obvious from the context that Ms. Carnohan knew the site was not UTLM's, but wasn't sure who had created it.

the products linked to the trademark. UTLM contends that its customers would exercise a reduced degree of care because books sold online are low-cost impulse purchases. However, one could also infer that potential customers of the UTLM bookstore are discerning and sophisticated about where they purchase books on controversial religious subjects. The district court concluded that the fifth factor was irrelevant to the likelihood of confusion analysis based on the difference between the Wyatt website and FAIR bookstore. As with the fourth factor, the absence of the UTLM trademark on the FAIR website or the FAIR bookstore lessens the chance that a consumer would be mislead into believing that she is visiting the UTLM online bookstore. Therefore, this factor does not weigh in favor of a finding of likelihood of confusion.

The final factor in determining likelihood of confusion is the strength of the mark—"[t]he stronger the mark, the greater the likelihood that encroachment on the mark will cause confusion." *Sally Beauty Co.*, 304 F.3d at 975. Strength consists of both conceptual strength, which refers to the placement of the mark along the distinctiveness spectrum, and commercial strength, which refers to the marketplace recognition value of the mark. *King of the Mt. Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1093 (10th Cir. 1999). UTLM did not submit any evidence to the district court of conceptual strength, and the district court determined that UTLM's evidence of search engine hits did not demonstrate that the mark had significant recognition value in the marketplace. The evidence

present in the record suggests that the commercial strength factor weighs against a finding of confusion. Even if we consider the arguments for conceptual strength, which were made for the first time on appeal, and thereby conclude that the mark is strong, that alone is insufficient to find a likelihood of confusion. A parody, of course, could not succeed if the trademark lacked any strength.

On balance, the six *Sally Beauty Co.* factors weigh against a finding of likelihood of confusion. Although we conclude that there is no likelihood of confusion based on this conventional analysis, the fact that the Wyatt website is a parody provides an even more convincing explanation of why consumers are unlikely to be confused.

The district court determined that the Wyatt website was a parody because it would be immediately apparent to anyone visiting the Wyatt website that it was not the UTLM website due to the differences in content.[9] The district court did not commit error in making this finding, as there are sufficient differences between the content and style of the two websites to avoid the possibility of confusion.

The fact that the Wyatt website is a successful parody weighs heavily

---

[9]Defendants did not raise the issue of parody in the district court except with reference to the cybersquatting claim. However, parody is not an affirmative defense that must be asserted by the defendant, but is simply a factor to be considered in determining the likelihood of confusion. *See World Wrestling Fed'n Entm't, Inc. v. Big Dog Holdings, Inc.*, 280 F. Supp. 2d 413, 431 (D. Pa. 2003).

against a finding of likelihood of confusion. A parody adopts some features of the original mark, but relies upon a difference from the original mark to produce its desired effect. *See Jordache Enters.*, 828 F.2d at 1486 ("An intent to parody is not an intent to confuse."); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 967 (10th Cir. 1996). In contrast, an unsuccessful parody—one that creates a likelihood of confusion—is not protected from an infringement suit. *See Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group*, 886 F.2d 490, 494 (2nd Cir. 1989) (confusing parodies are "vulnerable under trademark law"); *L.L. Bean*, 811 F.2d at 32 n.3 (confusing parodies "implicate[] the legitimate commercial and consumer protection objectives of trademark law").

In conclusion, UTLM failed to produce sufficient evidence to support a finding by a rational jury that UTAH LIGHTHOUSE is protectable, that Defendants' use was in connection with any goods or services, and that Defendants' use was likely to cause confusion among consumers as to the source of the goods sold on the FAIR online bookstore.

## C. Anti-Cybersquatting Protection Act

Congress enacted the Anti-Cybersquatting Protection Act (ACPA), 15 U.S.C. § 1125(d), to address "a new form of piracy on the Internet caused by acts

of 'cybersquatting,' which refers to the deliberate, bad-faith, and abusive registration of Internet domain names in violation of the rights of trademark owners." S. Rep. No. 106-140, at 4 (1999). The ACPA provides for liability if a person registers, traffics in, or uses a domain name that is identical or confusingly similar to a distinctive mark, with a bad faith intent to profit from that mark. 15 U.S.C. § 1125(d)(1)(A).

To prevail on the cybersquatting claim, UTLM must show (1) that its trademark, UTAH LIGHTHOUSE, was distinctive at the time of registration of the domain name, (2) that the domain names registered by Wyatt, including utahlighthouse.com and utahlighthouse.org, are identical or confusingly similar to the trademark, and (3) that Wyatt used or registered the domain names with a bad faith intent to profit. The district court ruled that Defendants' conduct did not involve a bad faith intent to profit and on that ground granted Defendants' motion for summary judgment on UTLM's cybersquatting claim. We review this ruling *de novo*.

As discussed in the trademark infringement section above, UTLM did not meet its burden of showing that UTAH LIGHTHOUSE is distinctive. Moreover, UTLM did not submit any evidence to the district court of the distinctiveness of the mark at the time that Wyatt registered the domain names, as required by 15 U.S.C. § 1125(d)(1)(A)(ii)(I). Hence, UTLM failed to meet its burden on the first element.

However, the second element of the cybersquatting claim is easily satisfied, as the domain names utahlighthouse.com and utahlighthouse.org are virtually identical to the trademark with the minor exceptions of spacing between "Utah" and "Lighthouse," and the addition of .com and .org.

As to the third element, UTLM did not demonstrate that Defendants used the domain names with a bad faith intent to profit. The ACPA enumerates nine nonexclusive factors to assist the court in determining whether the use of a trademark involves a bad faith intent to profit. *See* 15 U.S.C. § 1125(d)(1)(B)(i). It is not necessary to evaluate all of the factors because several of the factors readily defeat an inference that the Defendants intended to profit by using domain names similar to UTLM's trademark. The quintessential example of a bad faith intent to profit is when a defendant purchases a domain name very similar to the trademark and then offers to sell the name to the trademark owner at an extortionate price. A defendant could also intend to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's. Neither of these purposes is evident here.[10]

One factor is the domain name registrant's "bona fide noncommercial or

---

[10]UTLM did proffer evidence that during the time the Wyatt website was posted, the FAIR bookstore sold nine titles that were also offered by the UTLM bookstore. This is at most evidence that FAIR may have incidentally profited, but not that Wyatt intended to profit from the use of UTLM's trademark.

fair use of the mark in a site accessible under the domain name." 15 U.S.C. § 1125(d)(1)(B)(i)(IV). The district court determined that Defendants' use was entirely noncommercial, and a fair use parody, and therefore found that Defendants did not use the mark in bad faith. This is consistent with the reasoning of several other courts that a website that critiques a product and uses the product's trademark as the website's domain name may be a fair use. *See Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809 (6th Cir. 2004) (consumer registering domain name "lucasnursery.com" and complaining about nursery's work was not liable under ACPA); *TMI, Inc. v. Maxwell*, 368 F.3d 433 (5th Cir. 2004) (holding that a website with the purpose of informing other consumers did not create the harm the ACPA intended to eliminate); *Mayflower Transit, L.L.C. v Prince*, 314 F. Supp. 2d 362 (D.N.J. 2004) (finding no ACPA liability where Defendant registered "mayflowervanline.com," since the totality of circumstances demonstrated that registrant's motive was to express dissatisfaction in doing business with the mark's owner). Because Wyatt's parody offers an indirect critique and lacks an overt commercial purpose, it is similar to these consumer commentaries, and under the circumstances of this case, constitutes fair use.

Another critical factor is the defendant's intent to divert consumers to a website that "could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a

likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site." 15 U.S.C. § 1125(d)(1)(B)(i)(V). The district court concluded, and we agree, that the Wyatt website created no likelihood of confusion as to its source, or whether it was affiliated with or endorsed by UTLM. In the trademark infringement context, the plaintiff has the burden of proving likelihood of confusion. *Australian Gold*, 436 F.3d at 1238–39. Applying this same burden of proof to the likelihood of confusion in the context of cybersquatting, we conclude that UTLM failed to raise a genuine issue of material fact as to Defendants' intent to cause confusion about the source of the Wyatt website as a means of harming the goodwill of the UTAH LIGHTHOUSE mark.

Our evaluation of the nine statutory factors along with other evidence submitted by UTLM[11] leads us to conclude that Defendants lacked a bad faith intent to profit from the use of UTLM's trademark in several domain names linked with the Wyatt website. In addition, the ACPA contains a "safe harbor" provision, which precludes a finding of bad faith intent if "the court determines that the person believed and had reasonable grounds to believe that the use of the

_____

[11] UTLM also urges a finding of bad faith based on three factors not listed in the ACPA. Two of these allege that Wyatt was insufficiently diligent in ensuring that he was not infringing UTLM's trademark by using the domain names. The third factor involves a prior incident in which Wyatt registered a domain name containing the personal name of another critic of the LDS Church. However, none of these three additional factors supports an inference that Wyatt had a bad faith intent to profit from his use of UTLM's trademark.

domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

The district court reasoned that because the Wyatt website was a parody, Defendants could have reasonably believed that use of the domain names was legal. UTLM contends that Defendants lacked such a reasonable belief because they did not contact an attorney to verify the legality of the Wyatt parody. UTLM cites to no authority that an attorney's opinion is necessary to forming a good faith, reasonable belief in this context. We conclude upon *de novo* review that the safe harbor provision applies to Defendants' use.

The district court properly granted summary judgment on UTLM's cybersquatting claim.

* * *

The judgment of the district court is affirmed.