RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0205p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LIBERTARIAN NATIONAL COMMITTEE, INC.,

                *Plaintiff-Appellee*,

    *v.*

MICHAEL J. SALIBA; RAFAEL WOLF; GREG STEMPFLE;
ANGELA THORNTON-CANNY; JAMI VAN ALSTINE;
MARY BUZUMA; DAVID CANNY; JOSEPH BRUNGARDT,

                *Defendants-Appellants*.

> No. 23-1856

Appeal from the United States District Court for the Eastern District of Michigan at Ann Arbor.
No. 5:23-cv-11074—Judith E. Levy, District Judge.

Argued: June 11, 2024

Decided and Filed: August 28, 2024

Before: COLE, GIBBONS, and READLER, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Lena Shapiro, Lilian Alexandrova, Jonathan Resnick, UNIVERSITY OF ILLINOIS COLLEGE OF LAW, Champaign, Illinois, for Appellants. Joseph J. Zito, DNL ZITO CASTELLANO, Washington, D.C., for Appellee. **ON BRIEF:** Lena Shapiro, Lilian Alexandrova, Jonathan Resnick, UNIVERSITY OF ILLINOIS COLLEGE OF LAW, Champaign, Illinois, C. Nicholas Curcio, CURCIO LAW FIRM, PLC, Nuncia, Michigan, for Appellants. Joseph J. Zito, DNL ZITO CASTELLANO, Washington, D.C., for Appellee. Rebecca Tushnet, HARVARD LAW SCHOOL, Cambridge, Massachusetts, for Amici Curiae.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.  This trademark action arises out of a dispute within the Libertarian Party of Michigan (referred to by name or as the "Michigan affiliate"). The Libertarian National Committee, Inc. ("LNC") sued dissenting members of the Michigan affiliate—mainly former officers of the affiliate or board members of local parties—for using the LNC's trademark to hold themselves out as the official Michigan affiliate after a turnover of power resulted in two factions claiming to hold power.  The district court granted the LNC's request to preliminarily enjoin the dissenting members' use of the mark, and the dissenting members appealed.  They argue that the district court's application of the Lanham Act to the context of noncommercial speech both unduly expands the Act and violates the First Amendment.  Even if the Lanham Act covers the dissenting members' use of the trademark, they argue that their use was authorized and not likely to cause confusion.  We affirm in part and vacate in part the preliminary injunction.

I.

In 2022, two top officers of the Libertarian Party of Michigan resigned, expressing concern about a perceived shift in the ideology of the Libertarian Party's controlling caucus. After these resignations, the third most senior member, Andrew Chadderdon, became acting Chair of the Michigan affiliate.  Chadderdon was reportedly unpopular within the affiliate— especially with defendants, and his ascendance caused a dispute over the identity of the rightful leadership of the Michigan affiliate.  Dissatisfied with his leadership, defendants voted to remove Chadderdon from his executive committee position and then got elected to committee positions themselves.  Then, the Libertarian Party Judicial Committee determined that the election violated the applicable bylaws.  It reinstated Chadderdon and voided the executive appointments, including those of defendants, that resulted from the vote.  Defendants contest the validity of the Judicial Committee's action and view themselves as the rightful executive board members of the Libertarian Party of Michigan.

The LNC sided with Chadderdon and the Judicial Committee, with the LNC's Chair, Angela McArdle, informing defendant Joseph Brungardt that his representation of being the Chair of the Libertarian Party of Michigan was "patently false." DE 12-10, McArdle Email, Page ID 474. McArdle further directed Brungardt to stop using the LNC's trademarks to promote what the LNC viewed as an offshoot political party and an unauthorized convention.[1] After receiving McArdle's letter and a cease-and-desist order, defendants admit that they continued to use the LNC's registered trademarks to hold themselves out *as* the official Libertarian Party of Michigan in connection with soliciting donations, filing campaign finance paperwork, and promulgating platform positions, endorsements, and commentary critical of the Chadderdon-chaired group.

The LNC sued, bringing various claims of trademark infringement in federal court. The LNC then moved for a preliminary injunction barring defendants from continuing to use the LNC's mark. After holding a hearing, the district court granted the LNC's motion to enjoin defendants from using the trademark. Defendants timely appealed.[2]

## II.

A district court's decision to grant or deny a preliminary injunction involves consideration of four factors: (1) whether the movant demonstrated "a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012).

We typically review a district court's decision to grant a preliminary injunction for abuse of discretion. *Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003). In line with this

---

[1]The LNC owns of the following trademarks: Reg. No. 2,423,459, "Libertarian Party," and Reg. No. 6,037,046, made up of the word, "Libertarian," accompanied by an icon depicting a torch and an eagle. During the course of this suit, the parties jointly stipulated that defendants would not use the mark depicting a torch and eagle during the pendency of the proceedings. Only defendants' use of the first "Libertarian Party" mark remains at issue.

[2]In a separate order, the district court also denied defendants' subsequent request to stay the injunction pending this appeal.

standard, we "review the district court's legal conclusions de novo and its factual findings for clear error." *Id.* (quoting *Owner-Operator Indep. Drivers Ass'n v. Bissell*, 210 F.3d 595, 597 (6th Cir. 2000)).  The movant's likelihood of success on the merits is a question of law which we review de novo.  *See A.C.L.U. Fund of Mich. v. Livingston County*, 796 F.3d 636, 642 (6th Cir. 2015).  In a trademark infringement action, the first factor is typically dispositive of the validity of the preliminary injunction.  *See PGP, LLC v. TPII, LLC*, 734 F. App'x 330, 332 (6th Cir. 2018); *see also Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir. 1991).  Because the district court rested its irreparable harm and public interest determinations on the LNC's likelihood of success on the merits, we find the likelihood of success element dispositive.

## III.

This case largely turns on whether defendants' use of the LNC's mark to, among other things, solicit party donations, fill out campaign finance paperwork, advertise events, and espouse political platform positions and commentary falls within the scope of the Lanham Act. The Lanham Act imposes liability on:

> (1) Any person who shall, without the consent of the registrant—
>
>> use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . .

15 U.S.C. § 1114(1)(a).

Thus, a plaintiff alleging trademark infringement must show that: "(1) it owns the registered trademark; (2) the defendant used the mark in commerce; and (3) the use was likely to cause confusion."  *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (citing § 1114(1)).

## A.

Defendants first argue that they did not use the LNC's trademark "in connection with the sale . . . or advertising of any goods or services" as required by the Act.  15 U.S.C. § 1114(1)(a). They contend that, because the Lanham Act regulates trademark infringement only in

commercial speech as defined in the First Amendment context, their use of the LNC's trademark in the course of political speech falls outside the Act's reach.  For this position, defendants primarily rely on *Taubman Co. v. Webfeats*, 319 F.3d 770 (6th Cir. 2003), which discussed the interplay between the First Amendment and the Lanham Act in the context of a defendant's use of a trademark to discuss and critique the trademark's owner.  Contrary to defendants' position, we do not think *Taubman* resolves this case.

In *Taubman*, this Circuit addressed the use of a shopping mall's trademark in domain names by the creator of a "fan site" and, after the relationship between the parties soured, a gripe site for that mall.  319 F.3d at 772.  The website creator contended that his purpose for using the mall's trademark in his websites was expressive rather than commercial, and thus outside of the realm of the Lanham Act and protected by the First Amendment.  *Id.* at 774–76.  In combatting the defendant's allegation that the Lanham Act conflicted with the First Amendment, the *Taubman* Court reasoned that the Lanham Act is constitutionally sound "because it only regulates commercial speech, which is entitled to reduced protections under the First Amendment."  *Id.* at 774 (citing *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563 (1980)).  The court construed this limitation as statutory, stating that "any expression embodying the use of a mark not 'in connection with the sale . . . or advertising of any goods or services,' . . . is outside the jurisdiction of the Lanham Act and necessarily protected by the First Amendment."  *Id.* at 775 (quoting § 1114(1)).

Applying these strictures, *Taubman* held that the defendant's use of the trademark in connection with a website that displayed advertisements for his and his girlfriend's businesses was commercial and thus able to be regulated under the Lanham Act.  *Id.*  But after the defendant removed the advertisements and stipulated against future use, the court found the trademark use no longer "'in connection with the advertising' of goods and services" and thus no longer within the scope of the Act.  *Id.*  With no ongoing violation, the court deemed an injunction inappropriate.  *Id.*  *Taubman* then contemplated the First Amendment in the context of the defendant's second website—his gripe site, "taubmansucks.com."  *Id.* at 777–78.  Rejecting the shopping mall's trademark claim yet again, the court found the defendant's use protected by the First Amendment as "critical commentary" that created "no confusion as to source."  *Id.* at 778.

Thus, the use was "purely an exhibition of Free Speech" and "not subject to scrutiny under the Lanham Act." *Id.*

In explaining why the defendant's use of the mall's mark was protected expression, the *Taubman* Court expounded that the defendant used the mark to comment on the trademark holder—not "to designate source." *Jack Daniel's Properties, Inc. v. VIP Prods. LLC*, 599 U.S. 140, 155 (2023); *Taubman*, 319 F.3d at 778. In other words, the defendant did not use the mark to pass off the goods or services advertised on his website as those of the shopping mall. *Taubman*, 319 F.3d at 778.

Since *Taubman*, the Supreme Court has explained how the Lanham Act and the First Amendment interact when a defendant uses a trademark to misrepresent his or her goods or services as those of or associated with the trademark owner. Just last year, the Court noted that where a defendant uses a trademark as a source identifier, "[t]he trademark law generally prevails over the First Amendment." *Jack Daniel's Properties*, 599 U.S. at 159 (quoting *Yankee Publ'g Inc. v. News Am. Publ'g Inc.*, 809 F. Supp. 267, 276 (S.D.N.Y. 1992)). This is because use of a trademark as a source identifier undermines the primary function of trademark law, which is to prevent "misinformation[] about who is responsible for a product" or service. *Id.* at 157. Such is true even where the defendant's use of the mark also conveys an expressive message. *Cf. San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 536, 541 & n.19 (1987) ("The mere fact that the [nonprofit defendant] claims an expressive, as opposed to a purely commercial purpose does not give it a First Amendment right to appropriate to itself the harvest of those who have sown.") (cleaned up). In that circumstance, "the likelihood-of-confusion inquiry does enough work to account for the interest in free expression." *Jack Daniel's Properties*, 599 U.S. at 159.

We take this opportunity to clarify that *Taubman*'s language limiting the Lanham Act's coverage, while implicated where a defendant uses the mark purely for protected expression, like satire, critique, or commentary, does not prohibit application of the Lanham Act to a defendant who uses the trademark to identify the source of his or her competing goods or services. *Cf. Taubman*, 319 F.3d at 778 (finding the website creator's trademark use, which created "no confusion as to source," "purely an exhibition of Free Speech"). Because the defendants here

used the LNC's trademark to speak *as* the Libertarian Party of Michigan, defendants used the mark to designate the source of their political services as affiliated with the LNC, thus implicating "the core concerns of trademark law" and rendering *Taubman* inapposite. *Jack Daniel's Properties*, 599 U.S. at 157 (citation omitted); *cf. Taubman*, 319 F.3d at 778 ("[T]he First Amendment protects critical commentary *when there is no confusion as to source*.") (emphasis added).

Defendants resist this conclusion by emphasizing that *Jack Daniel's Properties* contemplated trademark infringement in the context of commercial products—a context in which trademark law traditionally and comfortably operates. True, trademark law was designed to combat potential consumer confusion and the theft of the trademark owner's goodwill in the context of commercial sales. *See Jack Daniel's Properties*, 599 U.S. at 156–57 (discussing the function of trademarks in terms of producers and manufacturers). And we acknowledge that outside of the facts before us, speech rendered in connection with the provision of political services typically constitutes political speech awarded heightened protection under the First Amendment. *See Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 302 (2022) (detailing the extent of First Amendment protection in the context of political campaigns). But we find support in *Jack Daniel's Properties* for our position that, in the narrow context where a defendant uses the trademark as a source identifier, the Lanham Act does not offend the First Amendment by imposing liability in the political arena.

While explaining why a predicate First Amendment test, rather than ordinary trademark scrutiny, does not apply when a defendant uses a trademark as a source identifier, *Jack Daniel's Properties* cited a case remarkably similar to the case at hand. 599 U.S. at 155. In *United We Stand America, Inc. v. United We Stand, America New York, Inc.*, the Second Circuit contemplated a trademark infringement action by United We Stand America, Inc., which owned the slogan, "United We Stand America." 128 F.3d 86, 88 (2d Cir. 1997). After friction within the group, the defendant created an offshoot political coalition, "United We Stand, America New York, Inc." which also used the slogan to engage in political activities. *Id.* The Second Circuit deemed the defendant's trademark use within the scope of the Lanham Act and outside the protection of the First Amendment because the offshoot group used the trademark "as a source

identifier" for the group's political services rather than to pose "commentary on [the trademark's] owner." *Id.* at 92. Accordingly, such use subjected the defendant to Lanham Act liability even though the offshoot coalition "might communicate its political message more effectively by appropriating [the trademark]." *Id.* at 93.

The Supreme Court cited *United We Stand* with approval of the Second Circuit's decision to apply ordinary trademark scrutiny even though the defendant's use of the slogan also "had expressive content." *Jack Daniel's Properties*, 599 U.S. at 155. Because the offshoot political coalition used the trademark "to suggest the 'same source identification' as the original 'political movement,'" such use was not insulated from Lanham Act liability. *Id.* (quoting *United We Stand*, 128 F.3d at 93). We find the Supreme Court and the Second Circuit's reasoning persuasive. Focusing on the use of a trademark as a source identifier adequately accounts for the core interests undergirding trademark law without "suck[ing] in speech on political and social issues through some strained or tangential association with a commercial or transactional activity." *Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 323 (4th Cir. 2015). Thus, in the narrow context before us, where a defendant uses a trademark as a source identifier, we find the extension of the Lanham Act into the political sphere appropriate.

Defendants next contend that, as a political entity, they do not render the type of services included in the scope of the Lanham Act. Accordingly, they argue, their use of the LNC's mark in connection with these services is not prohibited by the Lanham Act. A "service" is an "amorphous concept, 'denot[ing] an intangible commodity in the form of human effort, such as labor, skill, or advice.'" *Id.* (citation omitted). As defendants used the LNC's trademark to advertise a political convention, operate a website, promulgate political news and party activities, file campaign finance reports, endorse candidates, and solicit donations, they "unquestionably render[ed] a service" contemplated by § 1114(1)(a). *United We Stand*, 128 F.3d at 90 (finding "services characteristically rendered by a political party to and for its members, adherents, and candidates," like political organizing, maintaining an office, endorsing candidates, and distributing partisan material to be "services" under the Lanham Act); *see also Wash. State Republican Party v. Wash. State Grange*, 676 F.3d 784, 795 (9th Cir. 2012) ("The Libertarian Party correctly points out that 'services' can include activities performed by a political party.").

Courts have long construed the Lanham Act's requirement that a defendant use a trademark in connection with the advertisement of "any goods or services" to encompass trademark infringement by political or nonprofit defendants. *See United We Stand*, 128 F.3d at 89–90 (citing *N.A.A.C.P. v. N.A.A.C.P. Legal Def. & Educ. Fund*, 559 F. Supp. 1337, 1342 (D.D.C. 1983), *rev'd on other grounds*, 753 F.2d 131 (D.C. Cir. 1985)); *Am. Diabetes Ass'n, Inc. v. Nat'l Diabetes Ass'n*, 533 F. Supp. 16, 20–21 (E.D. Pa. 1981) (applying Lanham Act to nonprofit's use of competing nonprofit's trademark to solicit donations), *aff'd*, 681 F.2d 804 (3d Cir. 1982) (Table); *U.S. Jaycees v. Phila. Jaycees*, 639 F.2d 134, 146 (3d Cir. 1981) (enjoining disaffiliated civic group from using trademark of national group after ideological split); *cf. U.S. Jaycees v. S.F. Jr. Chamber of Com.*, 354 F. Supp. 61, 71 (N.D. Cal. 1972) (agreeing that "benevolent, religious, charitable or fraternal organizations" are entitled to injunctive relief in the context of a common law unfair competition claim when local chapters disaffiliate but continue to use the organization's name), *aff'd*, 513 F.2d 1226 (9th Cir. 1975) (per curiam).[3] This history reflects the longstanding recognition that "[t]he protection of the trademark or service mark of non-profit and public service organizations," just as for for-profit entities, "requires that use of the mark by competing organizations be prohibited." *United We Stand*, 128 F.3d at 89; *see also* 1 McCarthy on Trademarks and Unfair Competition § 9:6 (5th ed. 2024) ("Names of professional and fraternal organizations are given the same protection against confusing use of their names as is given to business corporations. . . . Protection is [also] extended to the names of nonprofit political groups . . .").

And because defendants used the LNC's mark to identify the source of these services, they used the mark "in connection with" the advertising or distribution of services within the scope of the Lanham Act. *See* 15 U.S.C. § 1114(1)(a); *see also Radiance Found.*, 786 F.3d at

---

[3]District courts have also applied the Lanham Act to enjoin unions and political actors from using trademarks as source identifiers in the provision of services. *See Brach Van Houten Holding, Inc. v. Save Brach's Coal. for Chi.*, 856 F. Supp. 472, 475–77 (N.D. Ill. 1994) (defendant advocacy group's use of trademark in the provision of advocacy services for workers constituted "service[s]" within the meaning of the Lanham Act); *Republican Nat'l Comm. v. Canegata*, No. 3:22-cv-0037, 2022 WL 3226624, at *3–9 (D.V.I. Aug. 10, 2022) (enjoining former chairman of local Republican party who continued to portray himself as the chairman from using RNC trademarks); *Partido Revolucionario Dominicano (PRD) Seccional Metropolitana de Washington-DC, Maryland y Virginia v. Partido Revolucionario Dominicano, Seccional de Maryland y Virginia*, 312 F. Supp. 2d 1, 10–16 (D.D.C. 2004) (enjoining offshoot political chapter from using trademarked name to offer political services and noting that Lanham Act "protections extend to the names and symbols related to political organizations").

323 ("[I]f in the context of a sale, distribution, or advertisement, a mark is used as a source identifier, we can confidently state that the use is 'in connection with' the activity."). Defendants assert that this finding conflicts with almost every other circuit to consider the matter. But we find this to be an overstatement. As discussed above, we are not the first to apply the Lanham Act against nonprofit or even political defendants rendering services. And the cases identified by defendants are readily distinguishable: they dealt with defendants using trademarks to engage in social commentary about the trademark holder's goods or services—not for source identification of their own.

For example, the Ninth Circuit in *Bosley Medical Institute, Inc. v. Kremer* deemed a defendant's use of a trademark in a domain name of a website created to complain about the trademark holder's services not "in connection with a sale of goods or services" and thus not prohibited by the Lanham Act. 403 F.3d 672, 677–80 (9th Cir. 2005). Like other courts, it held that the Lanham Act simply did not seek to protect against an infringer who is not the trademark holder's competitor, but rather its critic. *Id.* at 679; *see also Utah Lighthouse Ministry v. Found. For Apologetic Info. & Research*, 527 F.3d 1045, 1053–54 (10th Cir. 2008) (addressing different section of the Lanham Act and finding the use of a trademark to create a parody website outside the Act's scope as "merely . . . a comment on the trademark owner's goods or services" rather than a use "in connection with the goods or services of a competing producer"); *Farah v. Esquire Magazine*, 736 F.3d 528, 541 (D.C. Cir. 2013) (assessing different section of the Lanham Act and finding that a defendant's use of a trademark in a satirical article about the trademark holders' political positions constituted "political speech" rather than the promotion of competing goods or services); *Radiance Found.*, 786 F.3d at 327–30 (finding the use of the NAACP's name in an article title criticizing the organization's stance on abortion not actionable).

Although many of these cases framed the inquiry into whether the defendant's trademark use was commercial, common to all these cases is the absence of the fact we find dispositive here: that the defendant's trademark use served a source identification, rather than expressive, end. *See, e.g.*, *Utah Lighthouse Ministry*, 527 F.3d at 1054 ("Unless there is a competing good or service labeled or associated with the plaintiff's trademark, the concerns of the Lanham Act are not invoked."); *cf.* McCarthy on Trademarks and Unfair Competition § 9:6 (5th ed. 2024)

(explaining that while § 43(a) contains a commercial activity requirement, the text of § 32(1)(a) (15 U.S.C. § 1114) does not). These cases are accordingly inapposite here, where the Lanham Act serves to prevent defendants from using the LNC's mark in connection with advertising and distributing their own political services *as* an entity affiliated with the LNC—not "in connection with the expression of [their] opinion *about*" the services of the LNC. *Bosley Med. Inst.*, 403 F.3d at 679; *cf. Radiance Found.*, 786 F.3d at 327 (positing that a nonprofit's use of a trademark to further activities like donation solicitation may satisfy the Lanham Act's "in connection with" requirement if the trademark denotes the source of the donation recipient). Thus, we remain convinced that the First Amendment tolerates the Lanham Act's interjection to prevent use of a trademark as a source identifier in a manner that creates confusion as to the source of the defendant's political services.[4]

### B.

Having found that that the Lanham Act can constitutionally apply to defendants' use of the LNC's mark, we next consider the other two elements of a Lanham Act claim: whether defendants' use was unauthorized and likely to cause confusion.

The Lanham Act prohibits the use of a trademark "without the consent of the registrant." 15 U.S.C. § 1114(1). In the context of a franchisee-franchisor relationship, courts have found that the plaintiff-franchisor must demonstrate that it properly terminated any license held by the defendant-franchisee to use the plaintiff's trademarks to support a finding that the defendant's use was truly unauthorized. *See, e.g.*, *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1308 (11th Cir. 1998). Here, defendants argue that they have a right to use the LNC's trademark as the Michigan affiliate through the licensing regime set out in the party's bylaws. Since the LNC did not follow the procedure set out in its bylaws to revoke the Michigan affiliate's license,

---

[4]In finding this application of the Lanham Act in harmony with the First Amendment, we reject defendants' argument that the injunction here presents an unlawful prior restraint on speech. While defendants describe the injunction as sweeping in any criticism of the LNC or Libertarian Party of Michigan, that is simply not the case. The district court clarified that the injunction merely prohibits defendants from identifying *as* the Libertarian Party of Michigan in the provision of services, it does not prevent them from identifying as members of the Libertarian Party or the Michigan affiliate, or from using the trademark to criticize or comment on either entity. We emphasize again that the Lanham Act does not restrict defendants' ability to engage in political speech. It merely restricts defendants from using the LNC's trademark to identify *as* the Libertarian Party of Michigan in connection with providing or advertising their own political services.

defendants argue that the license renders the LNC unable to show that defendants' continued use was unauthorized.  *See id.*; *see also Re/Max North Cent., Inc. v. Cook*, 272 F.3d 424, 430 (7th Cir. 2001); *Little Caesar Enter., Inc. v. Miramar Quick Serv. Rest. Corp.*, No. 19-1860, 2020 WL 4516289, at *3 (6th Cir. June 25, 2020).  We find this argument unavailing.

Contrary to defendants' argument, the LNC did not have to show that it disaffiliated the Libertarian Party of Michigan to show that defendants' continued trademark use was unauthorized.  The issue in this case is not whether the Michigan affiliate still possesses a license to use the LNC's trademark.  It does.  The LNC still recognizes a faction as the Libertarian Party of Michigan and allows the organization it recognizes to use the LNC's trademarks to identify itself.  The LNC alleges that it notified defendants that they lack a license to use the LNC's trademark to speak *as* the Michigan affiliate precisely because the LNC does not recognize them as the licensed affiliate's leadership.  *See* DE 12-7, Libertarian Party Bylaws, Page ID 454 ("There shall be no more than one state-level affiliate party in any one state.").

Whether the LNC's recognition of Chadderdon's group as the affiliate leadership is right or wrong, the cease-and-desist order conveying such recognition is sufficient to establish that defendants' continued use was unauthorized.  Defendants, as individual members of the Michigan affiliate, do not possess a contractual right to use the trademarks to speak *as* the Michigan affiliate.  Concluding otherwise would require that this panel find that the Judicial Committee's decision reinstating the Chadderdon-led team into their leadership roles was improper, that the LNC's recognition of the Chadderdon faction as the real Michigan affiliate was wrong, and that defendants are the rightful Michigan affiliate leadership.  Resolution of these issues is outside the scope of this case, and, in any event, would pose serious justiciability concerns.  *See Heitmanis v. Austin*, 899 F.2d 521, 525 (6th Cir. 1990) (explaining courts' history of "reluctan[ce] to intervene in intra-party disputes").

## C.

To succeed on its infringement claims, the LNC must lastly show that defendants used the trademark in a manner likely to cause confusion to consumers about the source of defendants' goods or services.  *See* 15 U.S.C. § 1114(1)(a); *Taubman*, 319 F.3d at 776.  For the

following reasons, we find that defendants' use of the trademark in the provision of political services (for example, the maintenance of a website containing political platforms, endorsing candidates, and filing campaign finance reports) creates a sufficient likelihood of confusion, but that defendants' use of the mark in connection with online solicitation, when accompanied by an appropriate disclaimer, does not.

"If different organizations were permitted to employ the same trade name in endorsing candidates, voters would be unable to derive any significance from an endorsement, as they would not know whether the endorsement came from the organization whose objectives they shared or from another organization using the same name." *United We Stand America*, 128 F.3d at 90. Thus, we agree with the district court that defendants' use of the LNC's trademark in connection with the provision of competing political services created a high likelihood of confusion for consumers, *i.e.*, potential voters, party members, and, in the case of solicitations not accompanied by a clear disclaimer, donors. *See All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 511 (5th Cir. 2018) (deeming voters who rely on political coalitions' endorsements the relevant "purchasers" of political services for assessing the confusion created by one coalition's use of a similar mark).

Defendants' use of the "Libertarian Party" mark meant that two different entities simultaneously held themselves out as the Libertarian Party of Michigan. A potential voter visiting defendants' website would not be able to tell if the platforms defendants espoused or events they advertised were actually affiliated with the Libertarian Party. *See id.* at 507–13 (finding political coalition's use of similar name and almost identical logo confusing); *see also Partido Revolucionario Dominicano (PRD) Seccional Metropolitana de Washington-DC, Maryland y Virginia*, 312 F. Supp. 2d at 13–16 (finding actual confusion in context of political groups using nearly identical names in advertising the sponsorship of events and affiliation with broader party). Given defendants' use of the LNC's exact mark in the provision of competing political services to the same target population, such risk is at play here. And this risk is not hypothetical—the LNC submitted at least some evidence of actual confusion about the sponsorship of competing conventions. This likelihood of confusion is sufficient to support a Lanham Act claim.

Defendants also used the LNC's trademark on their website to solicit donations. In connection with the donation tab, defendants displayed one of two pop-up disclaimers notifying the potential donor of the governance dispute, the LNC's recognition of the Chadderdon-led faction, and that any donations would be going solely to defendants. The disclaimers also included hyperlinks to the Chadderdon-led affiliate's website. By clearly explaining the identity of the donation recipient, these disclaimers ameliorated the confusion the Lanham Act seeks to prevent. *See Taubman*, 319 F.3d at 776–77 (noting that the relevant confusion concerns the source of the defendant's goods or services, not the source of the website). The disclaimers also resemble those we have previously found sufficient to eliminate a likelihood of confusion. *See id.* (citing *Holiday Inns, Inc. v. 800 Reservation Inc.*, 86 F.3d 619 (6th Cir. 1996)). Accordingly, defendants' use of the trademark in connection with their online solicitation of donations, when accompanied by appropriate disclaimers, does not create a sufficient likelihood of confusion as to the recipient of the funds and thus cannot be the predicate for Lanham Act liability. *See id.*; *see also Radiance Found.*, 786 F.3d at 328–29.

## IV.

We affirm the preliminary injunction granted except as to defendants' online solicitation accompanied by clear disclaimers.